UTE–CAL LAND DEVELOPMENT CORPORATION, Plaintiff, Respondent and Cross-Appellant,

v.

Robert R. SATHER and Bonnie Lee Sather, Defendants, Appellants and Cross-Respondents.

No. 16017.

Supreme Court of Utah.

Jan. 11, 1980.

---

Cullen Y. Christensen of Christensen, Taylor & Moody, Provo, for defendants, appellants and cross-respondents.

Robert M. McRae of McRae & Deland, Vernal, for plaintiff, respondent and cross-appellant.

MAUGHAN, Justice:

The defendants [1] bring this appeal from the jury's special verdict which found them guilty of acting maliciously and wilfully in gaining possession of a tract of land near Roosevelt, Utah. The defendants also appeal the jury's assessment of the amount the plaintiff owes them as guarantors of a

---

1. Robert R. Sather and his wife Bonnie Lee Sather and First Security Bank of Utah were co-defendants in the original action. Bonnie Lee Sather's role in the entire incident was passive in nature and she was named in the complaint merely because her name was found on the Warranty Deed which Ute-Cal placed in escrow with the bank under the guaranty agreement between itself and Sather. The bank while party to the initial action is not a party to this present appeal.

loan between the plaintiff and First Security Bank of Utah, and the trial court's refusal to grant interest on the amount owed. The plaintiff cross-appealed the jury's determination. It found he suffered no damages, because of the acts of the defendants. He requested a new trial on the issue of damages. We affirm the jury verdict and decision of the trial court, and deny the plaintiff's request for a new trial. All statutory references are to Utah Code Annotated, 1953, as amended.

Ute-Cal Land Development Corporation, hereinafter "Ute-Cal," initiated this action in district court to regain possession of a tract of land known as the Moss Ranch. The property, which the plaintiff intended to develop into a recreational facility, was used as collateral for a $40,000 loan received from the First Security Bank of Utah, Roosevelt, Utah, hereinafter "Bank." This loan, which Ute-Cal applied for on October 11, 1972, was also secured by the personal guarantees of the President of Ute-Cal, Pete J. Buffo, hereinafter "Buffo," and the defendants, Robert R. Sather and Bonnie Lee Sather, hereinafter collectively "Sather."

At the time of this first loan Buffo and Robert Sather were close personal friends and business associates, and were involved in several assorted business transactions. When Ute-Cal applied for the October 11th loan, Buffo acting as President of the corporation entered into an agreement with Sather under the terms of which Sather was to receive a Warranty Deed to the Moss Ranch upon Ute-Cal's default and Sather's repayment of the loan. A copy of this written agreement accompanied by a Warranty Deed conveying the property to Sather was delivered to the bank with a note securing the loan.

The principal factual disputes in the present action stem from a subsequent loan between Ute-Cal and the Bank. The reason Ute-Cal borrowed the additional money and the use of the additional funds represent the basis of the present controversy.

Buffo alleged at trial that on September 15, 1973, Sather came to his office in Torrance, California, and requested Buffo loan him $25,000. In his testimony Buffo explained:

Q. And what was the purpose of the meeting?

A. The purpose of the meeting? Bob (Sather) had flown down the night before and said that he had to see me on a matter of grave importance. That he had bought some diamonds and was in serious financial trouble and needed $25,000.

\* \* \* \* \* \*

Q. Alright and can you relate the rest of the conversation?

A. Well, I told him that I didn't have $25,000 and he said that he had taken the liberty to go to First Security Bank and make arrangements to borrow. At that time the $40,000 loan that we had originally taken out I had paid on was down to $20,000[2] and he said that he had made arrangements with the bank to make a loan for $50,000 and if I would go ahead and borrow $50,000 on the property in Utah, then we could go ahead and give him $25,000 of it.[3]

In contrast to this testimony, Sather claims the money which he received from Ute-Cal was in payment of prior debts between the two. Buffo acknowledged monies had been loaned back and forth between the two but in his testimony stated:

. . . I told him, at the September 15, 1973 meeting, that there had been conversations and rumors around from other people that he was telling that I owed him money and that I had prepared an accounting and sent it to them and that I didn't feel that I owed him any money.

---

**2.** The original loan was to be repaid in two installments plus interest and had a maturity date of October 1, 1973.

**3.** The trust note for the September loan and the guaranty agreement between Buffo and Sather both are dated September 15, 1973, corroborating Buffo's testimony that he signed those documents on that day in California.

Buffo explained his motivation in securing the additional funds when he testified:

I told him (Sather) rather than injure a friendship that I would like to sit down and get the accounting done [4] and that if he really needed to borrow the money on this, that we would go ahead and do this because he had accommodated me before when I was in trouble.

Subsequent to this meeting Sather returned to Utah and filed the application for the $50,000 loan with the bank on September 21, 1973. Along with the application Sather gave the bank the Trust Deed for the Moss Ranch which Buffo had signed and notarized in California. He also gave the bank a Guaranty Agreement, between Sather and Ute-Cal, similar to the one entered into between the parties at the time of the first loan.

Concerning his intent in entering into this guaranty agreement Buffo explained:

Then he (Sather) told me that the bank also would require another—this agreement here (indicating the guaranty agreement) besides and I told him that I didn't want to sign an agreement . .

\*    \*    \*    \*    \*    \*

. . . I told him that I didn't want to sign the agreement, have the use of the money. I was borrowing the money to give it to him so why should I sign an agreement if I didn't pay it back he would have the property. He said well that was the only thing that he could do and the only way that he could get the loan through the bank and I said that I will go ahead and sign the agreement providing you go ahead and cancel it so as soon as the loan is through I can go ahead and get my documents back from the

bank and Bob (Sather) said, 'Fine, I will take care of it.' [5]

At the same time Sather presented the bank with an unlimited personal guarantee of any and all Ute-Cal debts.

On September 24, 1973, the disbursement of the loan applied $20,000 to the renewal of the prior obligation, and credited the Ute-Cal account with the remaining $30,000. On the following day, September 25, 1973, Ute-Cal, under the signature of its President, Pete Buffo, issued a $25,000 check to Sather. This check was paid by the bank on September 27, 1973.

This presents the second factual dispute which involves the use of the proceeds of the loan. While Sather alleges he immediately applied the Ute-Cal check to the purchase of a savings certificate worth $25,000, several discrepancies exist as to the chronology of events surrounding this check and the savings certificate purchase.

A representative of the bank, Verl Haslem, testified the $25,000 check was used to purchase Savings Certificate No. 19479. However, while he stated certificates are not issued until they are paid for he acknowledged this certificate was dated September 25, 1973, but the check allegedly used as payment was not paid until September 27, 1973. [6]

Also, while the certificate was allegedly purchased for cash on September 25, 1973, it was not received by the bank as additional collateral until October 16, 1973. Thus, a period of 22 days elapsed between the disbursement of the proceeds of the loan and the bank's receipt of the required collateral, and 19 days lapsed between the payment of the check and the bank's receipt of the required additional collateral. [7]

4. This accounting is the subject of a separate suit.

5. The plaintiff introduced in evidence a copy of this agreement which contained a hand-written cancellation clause signed by Sather.

6. The two day difference denies the conclusion that the transactions spanned a weekend.

7. Further discrepancies surface concerning the requirement of the bond as additional collateral for the second loan. Although the initial loan application, which was received on September 21, 1973, was approved without the requirement of the $25,000 bond the final application for approval which was dated October 31, 1973, explicitly required the additional collateral.

Ute-Cal paid the first installment of the new loan on October 20, 1973, but failed to pay the following installment due on January 20, 1974. On March 25, 1974, Sather paid off the remainder of the Ute-Cal obligation and accepted delivery of the Warranty Deed. Sather cashed the $25,000 certificate and applied this money and $21,500 from his business account to cover the $46,500 which Ute-Cal owed the bank under the loan. This amount included both the principal and the interest payments due.

Prior to his acceptance of the Warranty Deed which the bank delivered to him under the terms of the Guaranty Agreement, Sather executed on March 15, 1974, a deed conveying the Moss Ranch property to James A. Sheya as security for a $70,000 loan. However, when Sather went to record this deed on March 25, 1974, he found the plaintiff had caused a Trust Deed covering the property to be recorded on November 2, 1973, securing a loan between itself and Silvio Fassio for the sum of $150,000. Upon notice of this encumbrance Sather requested and received from First Security Bank on April 5, 1974, an assignment of the original note from the $40,000 loan and the Trust Deed accompanying the second loan. Sheya later reconveyed the property to Sather, who retained actual possession and use of the property until the conclusion of the trial below.[8]

Following unsuccessful negotiations between Buffo and Sather concerning the reacquisition of the property and the repayment to Sather of monies expended as guarantor, Ute-Cal initiated the present suit to regain possession of the property and recover damages it incurred by the delivery of the Warranty Deed to Sather. Sather counterclaimed against Ute-Cal for monies spent in paying off the second loan.

At the conclusion of the evidence the jury was presented with a special verdict containing 13 questions. In answering these the jury found: (a) the second Guaranty Agreement between Sather and Buffo dated September 15, 1973, was cancelled prior to the time the Warranty Deed was delivered to Sather; (b) after subtracting any monies due Sather, Ute-Cal sustained no direct money damages as a result of the delivery of the Warranty Deed to Sather; (c) defendant Sather was guilty of wilful and malicious conduct against Ute-Cal, but assessed no punitive damages; (d) Ute-Cal was required to make a valid tender of $46,500 or any part thereof to Sather in order to regain possession of the Moss Ranch; and (e) Ute-Cal was entitled to the return of the Moss Ranch from Sather.

When the verdict was returned the plaintiff objected to the vagueness of the jury's answer concerning the amount owed Sather by Ute-Cal. In response to this objection the trial court submitted two additional interrogatories to the jury which asked whether the plaintiff owed any sum of money to Sather, and the specific dollar amount. The jury answered "yes" to the former, and stated that Ute-Cal owed Sather $21,500. No further objections followed these answers and the jury was dismissed by the court.

At the conclusion of the trial the plaintiff moved for a new trial on the issue of damages. Concurrently, the defendant Sather moved for a judgment notwithstanding the verdict to the effect that Sather was not guilty of wilful and malicious conduct toward the plaintiff. Sather also submitted to the trial court a motion to add interest to the amount found due from the plaintiff.

The trial court denied all the post-verdict motions of the respective parties and ordered upon the plaintiff's payment of $21,500 to Sather all of Sather's claims in and to the Moss Ranch would be terminated.[9]

---

8. In a separate occupying claimants suit Sather is attempting to recover the value of improvements which he made to the property. These improvements, exceeding $60,000 in value, include land clearing, irrigation and reservoir construction, evidence an intent on Sather's part for continued possession and use.

9. The trial judge excepted and reserved for subsequent trial questions of law and fact pertaining to defendant Sather's claims for the value of improvements rendered to the property.

The two parties appeal the denial of their various motions. The appeal and cross-appeal present four questions to this court: 1. Did Sather act wilfully and maliciously toward the plaintiff; 2. Does Sather have a right to a higher award for monies expended as guarantor of the loan; 3. Does Sather have a right to interest upon the amount due and owing; and 4. Does the plaintiff have the right to a new trial on the issue of damages? We will discuss these issues in the above order.

■ Sather contends the jury was unjustified in its findings of malicious conduct on the part of Sather toward the plaintiff. Throughout the three day trial voluminous testimony and numerous pieces of evidence were presented in an effort to reconstruct the circumstances of the transaction in question. The plaintiff presented specific evidence that the defendant Sather agreed to cancel their guaranty agreement for the $50,000 loan and actually signed a cancellation clause on a copy of the original agreement. He never informed the bank of this cancellation, and subsequently accepted delivery of the Warranty Deed from the bank under the terms of this agreement.

Similarly, several factual questions are raised by the evidence surrounding the renewal of the original loan. Specifically, representations made to Buffo by Sather concerning the requirement of a guaranty agreement between them, the questionable sequence of events involving the savings certificate, and the ultimate use of the proceeds of the loan to purchase the savings certificate support the conclusion that the defendant acted wilfully and maliciously in the transaction.

■ In viewing this evidence, this Court will upset the jury verdict only upon a showing by the appealing party that the evidence so clearly preponderates in his favor reasonable people could not differ on the outcome of the case.[10] Also, in determining if there was sufficient evidence to support the jury's verdict this Court will consider those facts which most strongly support the verdict and where there is any conflict in the evidence this Court will consider as true that evidence which supports the verdict.[11]

In the present situation the defendant failed to counter the evidence introduced by the plaintiff, which when considered under the above standard substantiates the jury's conclusion the defendant Sather acted wilfully and maliciously. That aspect of the verdict is supported by the evidence and will not be overturned by this Court.

The same standard of review applies to the second issue involving the amount the jury determined Ute-Cal owed Sather as guarantor of the loan.

■ At the trial, the plaintiff alleged the renewal of the original loan was motivated by Sather's financial dilemmas and his request for a $25,000 loan. Concurrent with the distribution of the proceeds of the loan Ute-Cal issued to Sather a check for $25,-000. Since $20,000 of the proceeds went to renew the prior debt, the $25,000 given Sather represented in essence the remainder of additional money that Ute-Cal received under the loan.[12] Although Sather contends the $25,000 payment was for repayment of prior debts between the two, he admittedly used the $25,000 to purchase Savings Certificate No. 19479. This certificate which was received by the bank as additional collateral for the $50,000 loan was eventually cashed by Sather and the proceeds applied to repay the loan.

As the trial judge pointed out, the final sum determined by the jury to be owing from Ute-Cal to Sather is the amount Sather paid the bank as guarantor of the loan minus the $25,000 delivered from Ute-Cal to Sather upon the disbursement of the loan proceeds. The second loan was for the benefit of Sather, and the $25,000 from the savings certificate which Sather used to

10. *Nelson v. Watts*, Utah, 563 P.2d 798, 799 (1977).

11. Id. at 798.

12. Ute-Cal paid the first installment on the loan with the remaining $5,000 received from the disbursement of the proceeds of the loan.

repay Ute-Cal's indebtedness came directly from the proceeds of the loan. The amount awarded has a legitimate basis in the evidence presented and we uphold the jury's determination.

██ We turn next to the trial court's denial of Sather's motion requesting the accrual of interest upon the jury's award. Rule 49, Utah Rules of Civil Procedure, provides:

> a. Special Verdicts . . . The court shall give to the jury such explanation and instruction concerning the matter thus submitted (as written interrogatories) as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issues so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment of the special verdict.

Although the issue of interest was ostensibly raised by the pleadings the defendant did not voice his claim until after the jury was dismissed. Under Rule 49(a) the defendant, therefore, waived the jury's consideration of this specific issue and instead presented it to the trial court for final determination.

██ The trial court found the jury had considered the issue of interest in its deliberation and its award in fact incorporated an interest payment.[13] Because of this conclusion the trial court did not supplement the jury's award and denied the defendant's motion.

Rule 49(a) grants to the trial court discretion in considering issues raised by the pleadings but not directly addressed by the jury under a special verdict. In the present case the court employed this power and rendered a decision. This decision was based on a consideration of the deliberative process of the jury, the nature of the jury award and the jury's responses to the special interrogatories.

The general rule which this Court follows is the judgment of the trial court will not be reversed unless it is shown the discretion exercised has been abused.[14] In arriving at his conclusion the trial judge considered several factors relevant to the amount and composition of the jury award. The trial court's decision was not arbitrary or capricious and, therefore, this Court will not alter it.

Finally we turn to the plaintiff's cross-appeal of the jury's denial of any monetary damages for the delivery of the Warranty Deed. After instructing the jury on the applicable law concerning the issue of damages, the court submitted, in the special verdict form, Question No. 4 which asked:

> After subtracting any monies due Mr. Sather from Ute-Cal Land Development

---

**13.** Specifically, on the question of adding interest to the jury award the trial court concluded: ". . . the court after reviewing the evidence and the case authority submitted by counsel finds that the jury included interest in the amount found to be due to defendant Sather. The jury was in deliberation for nearly nine hours. After returning the verdict the jury went back into deliberation to answer two further questions which was done. No further objectives or requests were made by counsel, whereupon the jury was dismissed. The amount the jury found to be due to defendant Sather was $21,500, which is a portion of $46,560, the amount the defendant Sather paid to the defendant First Security Bank. The jury apparently deducted there from $25,000 which defendant Sather received from the original loan. The $46,560 included interest thereupon,

the $21,500 found to be owing the defendant Sather. It also included a portion of the interest included in the $46,560. . . . The court is persuaded that it may under circumstances cited in the *Mourikas* case [*Mourikas v. Vardianos*, 169 F.2d 53 (4 Cir. 1948)] so act (to grant interest), however, it is the opinion of the court that under the facts, evidence and circumstances at hand, the jury included interest in the award made to the defendant Sather, thus excepting the case at hand from one that would be a proper subject for such relief. Accordingly, defendant Sather's Motion to add interest is denied."

**14.** *Pauly v. McCarthy*, 109 Utah 431, 184 P.2d 123 (1947).

corporation, what money damages, if any, did Ute-Cal Land Development sustain as a direct result of the delivery of the Warranty Deed to Mr. Sather?

The jury responded that Ute-Cal sustained no damages and in answering question 5(b) reiterated this finding. When the jury returned the verdict the plaintiff objected to the ambiguity of its answer to Question 12, concerning the amount the plaintiff was required to tender in order to regain possession of the Moss Ranch, but did not object to the form of and answers to the above questions.

Rather than objecting to this decision when the jury returned the verdict, the plaintiff filed a motion following the dismissal of the jury requesting a new trial. In support of this motion the plaintiff argues that this case falls within the reach of Rule 59(a)(6) which provides:

(a) . . . a new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes; . . .

(6) Insufficiency of the evidence to justify the verdict or other decision, or that it is against the law.

The plaintiff contends specifically evidence introduced at trial concerning mineral rent payments which the defendant received while in possession of the property renders the jury's answer to the above questions inconsistent with the evidence and against the law.

The defendant counters this by arguing the plaintiff waived any objection to the jury's determination by not objecting to the answers when they were originally returned.

It is the rule in Utah that a failure to object to a verdict, informal or insufficient on its face, before the jury is discharged, constitutes a waiver of that objection.[15] This standard is based in part on Rule 47(r), Utah Rules of Civil Procedure, which states:

If the verdict rendered is informal or insufficient, it may be corrected by the jury under the advice of the court, or the jury may be sent out again.

The essence of the rule was explained in *Cohn v. J. C. Penney, Inc.*:[16]

. . . The proper procedure when an informal or insufficient verdict has been returned is for the trial court to require the jury to return for further deliberation . . . . It is well established by numerous authorities that, when a verdict is not in the proper form and the jury is not required to clarify it, any error in said verdict is waived by the party relying thereon who at the time of its rendition failed to make any request that its informality or uncertainty be corrected.

The present case is very similar to *Langton v. International Transport*[17] in which the plaintiff was injured as a result of a collision involving the defendant's truck. The plaintiff's case was predicated on the defendant's negligence in stopping and parking the truck on the highway. Along with the damage to his vehicle and his medical expenses, the plaintiff lost 22½ day's work as a result of his injuries. However, even though the jury returned a verdict in favor of the plaintiff and against the defendant, it assessed damages as follows: General Damages: None; Special Damages: $868.25; Property Damages: $600.00; Total: $1,468.25.

In considering the defendant's claim, viz., the plaintiff's failure to object to the jury verdict at the time it was announced precluded his protest on appeal, this Court explained:

In the instant case, it must be conceded that if the plaintiff were entitled to an award of special damages, he was entitled

15. *Suniland Corp. v. Radcliffe*, Utah, 576 P.2d 847, 850 (1978) (Maughan, dissent).

16. *Cohn v. J. C. Penney Company, Inc.*, Utah, 537 P.2d 306, 311 (1975) (Quoting from *Brown v. Regan*, 10 Cal.2d 519, 75 P.2d 1063 (1938)).

17. *Langton v. International Transport, Inc.*, 26 Utah 2d 452, 491 P.2d 1211 (1971).

to be compensated, under the evidence for pain and suffering and a loss of 22½ days wages, irrespective of prospective damages, which the jury and trial court evidently doubted. Obviously, the jury failed to consider these items of damage. The verdict was defective in form in that it did not comprehend all the items of damages contained in the instructions given by the court, it was therefore insufficient.

\*   \*   \*   \*   \*   \*

If counsel be permitted to remain mute when a verdict is insufficient or informal, he gains an unfair strategic advantage [and since] there must be reasonable rules to control the termination of litigation, if counsel has an opportunity to correct error at the time of its occurrence and he fails to do so, any objection based thereupon is waived.[18]

█ In the present case the plaintiff alleges the verdict is insufficient as to damages suffered as a result of the delivery of the Warranty Deed. The plaintiff was under a responsibility to object to this patent insufficiency at the time the verdict was rendered. Since the plaintiff did not avail himself of the opportunity to object to the verdict before the jury was dismissed, any later objection to its insufficiency is waived.[19]

CROCKETT, C. J., and WILKINS, HALL and STEWART, JJ., concur.

---

18. Id., 491 P.2d at 1214.

19. The plaintiff could realize definite advantage in the present case because of the complexity of the factual issues involved, the duration of the trial and the vast volume of evidence presented. The instructions given to the jury by the court apprised them of the applicable law governing the recovery of damages in this action. In those instructions the jury was told that in determining the liability of the defendant Sather the jury was to consider the possi-

bility of mitigation of damages by Ute-Cal's tender of the monies expended by Sather as guarantor of the loan. They were also instructed on the restrictions to awarding speculative damages and the plaintiff admitted the exact amount received as rents could not be calculated. The plaintiff had ample opportunity to present evidence concerning the damages suffered during the trial and no injustice is rendered by denying the plaintiff an opportunity to "try again" with a new jury.