Claude BUNDY and Lori Bundy, Plaintiffs, Respondents and Cross-Appellants,

v.

CENTURY EQUIPMENT COMPANY, INC., a Utah corporation, and Rex Howell, Defendants, Appellants and Cross-Respondents.

No. 18270.

Supreme Court of Utah.

Nov. 2, 1984.

---

1. *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

2. *State v. Clayton*, Utah, 639 P.2d 168 (1981).

Randall E. Grant, Salt Lake City, for defendants, appellants and cross-respondents.

Joseph H. Bottum, Ogden, for plaintiffs, respondents and cross-appellants.

HALL, Chief Justice:

This appeal and cross-appeal involve the propriety of the money judgment entered against defendant on plaintiffs' allegation of fraud.

On January 22, 1977, defendant Century Equipment Company, Inc. (hereinafter "Century") sold an excavator to Continental Excavating (hereinafter "Continental") for $80,500 plus tax. Continental's president, Clifford Heber, individually guaranteed payment of the total purchase price. Financing was arranged through Northwest Acceptance Corporation (hereinafter

"Northwest") of Denver, Colorado, upon a purchase money security agreement and retail installment contract. Payments under the contract were to be $2,133 per month over a term of four years.

Following a very poor payment history, Heber and Continental finally defaulted on the contract. Their default prompted Northwest to invoke the recourse provision in the security agreement that required defendant to act as a collection agent for Northwest.

As a result, defendant entered into a supplemental agreement with Heber and Continental on September 9, 1977, that contained the following terms, in addition to those set forth in the original financing agreement: (1) payments were to be made to defendant in cash or by cashier's check; (2) payment by personal check would only be accepted if tendered one month in advance; and (3) the payment schedule was to be observed strictly. Despite the new agreement, however, Heber continued to be delinquent in making payments to Continental.

Finally, on or about March 15, 1978, Heber assigned Continental's interest in the excavator to plaintiffs Claude and Lori Bundy. Heber had come into contact with plaintiffs by responding to a newspaper ad wherein plaintiffs had offered to assume payments on a backhoe. The assumption was made by verbal agreement and upon Heber's representation that payments were current on the contract with defendant. Defendant was not given any notice of the agreement.

Plaintiffs took possession of the excavator and had operated it only two days when it broke down. It was then taken, apparently by Heber, to defendant's shop for repairs. Upon completion of the needed repairs, defendant, still unaware of the assignment to plaintiffs, refused to release the excavator to Heber since Heber and Continental owed defendant $7,802.12. That amount represented three monthly payments on the backhoe of $2,133 apiece and amounts owed on other purchases and repairs charged to Heber's open account.

After some negotiation, Heber made an agreement with defendant's president, James Maxedon, whereby Heber could secure the release of the excavator upon the tender of a $4,266 payment (representing two of the three delinquent monthly payments).

The evidence presented at trial with respect to the events that occurred following the agreement for release of the excavator was largely conflicting. Plaintiffs testified that on the morning of March 21, 1978, they were informed by Heber that the excavator had been repaired at defendant's shop and that a sum of $2,133 would be required to pay for the repairs and get the machine released. Plaintiffs further testified that upon receiving that information from Heber they each called the defendant company to inquire as to the nature of the repairs and to verify the amount quoted by Heber. Plaintiffs claimed they spoke with the company's treasurer, Rex Howell, and that he verified that the machine would be released upon payment of $2,133 for repairs to the "belly of the hoe." According to plaintiffs, nothing was mentioned by either Heber or Howell concerning delinquent payments or any other costs related to the excavator other than the cost of repairs.

Although defendant could not controvert plaintiffs' testimony as to the representations made to them by Heber, inasmuch as Heber could not be located and was therefore not available to testify at trial, defendant did attempt to controvert plaintiffs' testimony regarding communications with Howell and statements allegedly made by him. Defendant called upon Howell to testify regarding those alleged statements. Howell denied having made the statements attributed to him and added that he had never had a conversation by telephone or otherwise with either of the plaintiffs.

Mr. Bundy also testified that on the basis of the representations allegedly made to both him and his wife by Howell, he issued a check to defendant in the sum of $2,133, which he then delivered to Heber. He claimed that on the following morning,

March 22, Heber informed him that defendant, while accepting the $2,133 payment, had refused to release the excavator and was demanding an additional sum of money.

Defendant's evidence showed that Heber's tender of the $2,133 check on the morning of March 22 was accepted by Maxedon, but since it represented only one half of the amount previously agreed to by Heber and Maxedon for the release of the excavator (i.e., $4,266), Maxedon refused to give up possession of the excavator until the balance was paid. According to Maxedon's testimony, Heber agreed to bring the balance in later that day. Maxedon also testified that, while he was aware the check was drawn on the account of Bundy Excavating, he did not consider that fact to be of any significance since Heber had on previous occasions made payments with checks drawn on accounts other than his own, all his dealings had been with Heber, and he had not been informed of the agreement between Heber and plaintiffs.

Upon receiving word from Heber that defendant refused to release the excavator but had accepted and kept the $2,133 check, plaintiffs testified that Mrs. Bundy went immediately to Walker Bank to stop payment on the check and that Mr. Bundy went to defendant's office to get the check back. Mrs. Bundy testified that she arrived at the bank at approximately 9:30 a.m. on March 22 and while there was informed by Dorothy Stone, Walker Bank's employee, that payment on the check could not be stopped because a cashier's check had already been issued that morning to defendant. Mrs. Stone affirmed Mrs. Bundy's statements in her testimony and added that she thought her conversation with Mrs. Bundy had taken place at approximately 10:00 or 10:30 a.m.[1]

Mr. Bundy testified that after his wife left for the bank he went directly to defendant's office and requested that Mr. Howell return the check. His request was purportedly denied, and he was invited to sue.

The only aspect of plaintiffs' evidence regarding the cashing of the check disputed by defendant is with respect to the exact time it occurred. Maxedon and Howell each testified that the check was not cashed until around noon on March 22.

As to Mr. Bundy's alleged conversation with Howell in defendant's office, Maxedon testified that it was he who had that conversation with Mr. Bundy, not Howell. Maxedon further claimed that Mr. Bundy did not ask for his money back; rather, Bundy demanded the release of the equipment.

Plaintiffs claim that they would never have issued the check to defendant or released it to Heber if they had known it was going to be applied to Heber's delinquent payments, of which they were entirely unaware, rather than toward repairs as had been represented by both defendant and Heber. Because they were thus misled, plaintiffs brought this action against Century and Rex Howell, alleging fraud and conversion.

The trial court directed a verdict of no cause of action as to Rex Howell. The case was submitted to the jury as to Century. The jury returned a verdict against Century on the allegations of fraud in the amount of $2,133 general damages and $75,000 punitive damages. The jury found no loss of anticipated profits and no cause of action as to the claim for conversion.

Defendant moved the court for judgment notwithstanding the verdict or, in the alternative, for a new trial, as well as for remittitur or, in the alternative, a new trial. The court entered judgment against defendant for $2,133 general damages, but granted defendant's motion for remittitur and ordered that the $75,000 punitive damages award be reduced to $25,000 as a condition of denying defendant's motion for a new

1. Plaintiffs also offered the check into evidence to show that, although it had originally been stamped "for deposit only" into defendant's account, the endorsement had been crossed out and the check had been endorsed for defendant by Rex Howell and cashed hurriedly at plaintiffs' bank.

trial. This condition was accepted by plaintiffs. The judgment was accordingly entered on January 25, 1982, in the amount of $2,133 general damages and $25,000 punitive damages. Defendant appeals the judgment of the court granting the damages as set forth above. Plaintiffs have cross-appealed for a reinstatement of the original punitive damages verdict.

Defendant assigns the following as error: (1) the verdict is not supported by the evidence and is contrary to the law; (2) the issue of fraudulent misrepresentation should not have been submitted to the jury; (3) the issue of punitive damages should not have gone to the jury; (4) the court failed to apply appropriate equitable principles in submitting the case to the jury; and (5) the judgment for punitive damages in the amount of $25,000 was excessive.

██ We dispose of the first four of these assignments of error by adhering to well-established principles of appellate review. The first such principle is that this Court will upset a jury verdict, "only upon a showing that the evidence so clearly preponderates in favor of the appellant that reasonable people would not differ on the outcome of the case." [2]

██ Although in conflict, there is substantial, credible evidence in the record that supports the jury's determination that defendant committed fraud upon plaintiffs. As was its prerogative to do, the jury chose to believe plaintiffs' testimony and to discredit that of defendant on the issues. Being supported by competent evidence, the verdict must stand.

██ The second principle that governs our disposition of these issues is that matters neither raised in the pleadings nor put in issue at the trial cannot be considered for the first time on appeal.[3] In this regard, the Court has said:

Orderly procedure, whose proper purpose is the final settlement of controversies, requires that a party must present his entire case and his theory or theories of recovery to the trial court; and having done so, he cannot thereafter change to some different theory and thus attempt to keep in motion a merry-go-round of litigation.[4]

██ Defendant's first four assertions of error are based upon three theories that were neither pled nor argued at trial: legal rights and obligations of an assignee under the Uniform Commercial Code, statutory obligations to perform as a bar to recovery for fraudulent misrepresentation, and the equitable doctrine of "clean hands." Consequently, we decline to consider these points on appeal.

We next address the parties' contentions with respect to the amount assessed by the trial court as punitive damages. Defendant contends the award exceeds that which the evidence can sustain. Accordingly, it seeks to have the award reversed. Plaintiffs, by contrast, argue that the evidence supports the award of $75,000 assessed originally by the jury and that the remission of that award to $25,000 was therefore improper. They seek to have the original award reinstated.

██ This Court's review of a trial court's assessment of punitive damages is governed by a well-settled standard:

In reviewing the amount of a punitive damages award, this Court ordinarily defers to the discretion of the fact finder. However, where it appears that such an award has resulted from passion or prejudice rather than from reason and justice, this Court must not permit it to stand. In the absence of evidence in the trial record evincing such passion or prejudice, such may be shown by the exces-

---

2. *E.A. Strout Western Realty Agency v. W.C. Foy & Sons,* Utah, 665 P.2d 1320, 1322 (1983); *Ute-Cal Land Dev. Corp. v. Sather,* Utah, 605 P.2d 1240, 1245 (1980).

3. See *Rosenlof v. Sullivan,* Utah, 676 P.2d 372 (1983); *Lamkin v. Lynch,* Utah, 600 P.2d 530 (1979).

4. *Simpson v. General Motors Corp.,* 24 Utah 2d 301, 303, 470 P.2d 399, 401 (1970).

sive amount of the punitive damages award itself.[5]

The record indicates that the basis for the judge's order that the jury's award be reduced to $25,000 was his finding that the award was "excessive." The record does not, however, reveal what factors or considerations led the judge to that finding.

■ Some factors that should have been considered by both the jury and the trial judge in determining the amount of the award are: the relative wealth of the defendant, the nature of his alleged misconduct, the facts and circumstances surrounding such misconduct, the effect thereof upon the lives of the plaintiff and others, the probability of future recurrence of the misconduct, the relationship between the parties, and the amount of actual damages awarded.[6]

■ As to the first of these factors, i.e., the relative wealth of the defendant, the record is devoid of any evidence regarding defendant's assets or net worth. Thus, it is evident that neither the jury nor the trial judge considered this factor in establishing the award for punitive damages. This Court has held that in the absence of such evidence the award cannot be sustained. For example, in *Cruz v. Montoya,*[7] we stated:

> Punitive damages should be more than an inconvenience to Val. Their amount should be sufficient to discourage him, or anyone similarly situated, from repeating such conduct in the future. However, the record contains no evidence that his disposable income of $567.05 semi-monthly as a salaried policeman (indicated in the record by a writ of garnishment) was known to the jury. Nor does the record contain any evidence of his assets or net worth which the jury could have considered in determining the amount they

would award. In view of that void and the fact that the jury was generous in its award of general damages, we conclude that the punitive damages against Val were excessive ....[8]

In *Nelson v. Jacobsen,*[9] the Court said:

> [T]he award of $25,000 in punitive damages in this case could not be sustained ... because it was entered without adducing any evidence or making any findings of fact regarding defendant's net worth or income.... Thus, the defendant's net worth and income are always relevant in determining the amount of punitive damages that would be appropriate for punishment.[10]

The excessiveness of the award is further established by the evidence in the record pertaining to the other factors listed above. This evidence indicates that at the time the misconduct occurred Heber and Continental were in default on their payment obligation to defendant under the supplemental financing agreement. Further, the defendant had dealt only with Heber concerning the excavator and, since it had not been informed of the agreement between Heber and the plaintiffs, was totally unaware of plaintiffs' interest in the excavator until the day of the incident at issue here. Such facts suggest that defendant's misconduct was motivated not purely out of vindictiveness or ill will toward plaintiffs, but rather, at least to some extent, out of a desire to recover what was owing on the excavator. Thus, defendant's conduct under these circumstances, although reprehensible, did not reflect a high degree of malice. In addition, such unique circumstances do not demonstrate a probability that defendant will repeat such misconduct in the future.

■ The amount awarded as punitive damages in this case ($25,000) exceeded the

---

5. *First Security Bank v. J.B.J. Feedyards,* Utah, 653 P.2d 591, 599 (1982).

6. *Cruz v. Montoya,* Utah, 660 P.2d 723 (1983); *First Security Bank v. J.B.J. Feedyards, supra* note 5; *Terry v. Zions Cooperative Mercantile Institution,* Utah, 605 P.2d 314 (1979).

7. *Supra* note 6.

8. *Montoya, supra* note 6, at 727.

9. Utah, 669 P.2d 1207 (1983).

10. *Id.* at 1219.

award of actual or compensatory damages ($2,133) by 11.72 times. This Court has recently reaffirmed that "punitive damages must bear a reasonable relationship to actual damages."[11] In light of the authority in this jurisdiction with respect to what constitutes a "reasonable relationship" between punitive and actual damages,[12] we hold that the relationship here (i.e., 11.72 to 1) is grossly disproportionate.

▮ It is well settled that when an award of punitive damages is determined on appeal to be excessive or otherwise inappropriate, this Court may order a new trial on the issue of damages or, in the alternative, remission of a portion of the punitive damages by the plaintiff. The Court elects to proceed upon the former alternative in this case.

Accordingly, the judgment of the trial court is affirmed in part, and the case is remanded for a redetermination of punitive damages consistent with this opinion. No costs awarded.

STEWART and HOWE, JJ., and BOYD BUNNELL, District Judge, concur.

DURHAM, Justice (concurring and dissenting).

I join the majority opinion in all respects except for its remand of the issue of punitive damages for a "redetermination," from which I dissent. The majority opinion lists the criteria that must be considered by the jury and the trial judge in assessing punitive damages, citing this Court's opinions in *Cruz v. Montoya*, Utah, 660 P.2d 723 (1983), *First Security Bank of Utah v. J.B.J. Feedyards*, Utah, 653 P.2d 591 (1982), and *Terry v. Zions Cooperative Mercantile Institution*, Utah, 605 P.2d 314 (1979). The opinion then points out the fact that there is absolutely no evidence in this record on one of the most significant of those criteria: the assets and net worth of the defendant. Absent such evidence, it

is difficult to know, not only on what basis the jury reached its verdict and the trial judge his remittitur order, but also on what basis the majority itself determines the "excessiveness" of the award. I see no reason to give the plaintiff an opportunity on remand to do what it failed to do at trial, namely, to put on evidence necessary for recovery. Having failed to put on an adequate case for punitive damages, the standards for which have been explicitly described in our case law, the plaintiff is not entitled to a "second shot," and the punitive damage award should simply be reversed.

ZIMMERMAN, J., does not participate herein.

---

11. *Montoya, supra* note 6, at 727.

12. *Montoya, supra* note 6; *Leigh Furniture & Carpet Co. v. Isom*, Utah, 657 P.2d 293 (1982); *Layton v. Crossroads Equipment Co.*, Utah, 655

P.2d 1125 (1982); *First Security Bank v. J.B.J. Feedyards, supra* note 5; *Elkington v. Foust*, Utah, 618 P.2d 37 (1980); *Terry, supra* note 6.