2006 UT App 218

**Ricardo BALDERAS, Plaintiff and Appellant,**

v.

**Joseph STARKS, Defendant and Appellee.**

**No. 20041111–CA.**

Court of Appeals of Utah.

May 25, 2006.

Mel S. Martin and Edward T. Wells, Murray, for Appellant.

David N. Mortensen, Provo, for Appellee.

Before Judges BILLINGS, McHUGH, and ORME.

## OPINION

McHUGH, Judge:

¶ 1 Appellant Ricardo Balderas appeals the trial court's refusal to order additur or grant a new trial after the jury awarded less in damages than he sought. He also appeals the trial court's admission of testimony from an expert accident reconstructionist retained by Appellee Joseph Starks. We affirm.

## BACKGROUND

¶ 2 On January 1, 2001, Starks's Mazda MX–6 rear-ended Balderas's Chrysler New Yorker at a low speed in an icy parking lot. Balderas exited the vehicle after the collision and told Starks that he had been in a prior rear-end accident. Balderas's vehicle sustained very minor bumper damage, and Starks's vehicle sustained no damage. Balderas claimed he was injured in the collision and brought an action for negligence. Starks's defense was that Balderas was not injured in the collision.

¶ 3 Dr. Duy Tran, a chiropractor, saw Balderas five days after the accident and diagnosed him with neck injuries. He treated Balderas until April 3, 2001, when he determined that Balderas had reached maximum medical improvement. Each visit to Dr. Tran required Balderas to drive sixty miles round-trip.

¶ 4 Balderas had been in a previous accident in 1999 and received treatment from Dr. Tran until 2000 for a neck injury, pain, and numbness in his hands. Balderas completed his treatment for the 1999 accident only seven months before the 2001 accident. Dr. Tran estimated that Balderas's injuries from the 1999 accident resulted in fifteen percent total permanent impairment and that Balderas would continue to suffer back pain for the rest of his life. After the second accident, Dr. Tran initially diagnosed Balderas with only eight percent total impairment, but that rating was subsequently changed back to fifteen percent.[1]

¶ 5 Prior to trial, Starks hired Dr. Paul France, an accident reconstructionist, to render an expert opinion on whether the forces generated in the accident could have caused the injuries claimed by Balderas. Balderas filed a motion in limine to exclude the testimony of Dr. France. The trial court conducted a hearing to determine whether Dr. France's testimony was supported by sufficient foundation. After this hearing, the trial court allowed Dr. France to testify.

¶ 6 A two-day jury trial took place in September 2004. Balderas testified that he believed Starks's vehicle was traveling ten to fifteen miles per hour when it hit his car. He stated that following the accident with Starks his arm would go numb, tingle, and sometimes ache, but that he was able to continue working. Balderas admitted that he did not mention the accident with Starks to his family practitioner, Dr. Moore, even though Dr. Moore treated him for another condition two weeks after the accident. Dr. Moore, however, had provided some treatment to Balderas after the 1999 accident. Balderas testified that the 2001 accident affected his ability to participate in his hobbies, including repairing cars.

¶ 7 Dr. Tran testified that the accident exacerbated the 1999 injuries. He also testified that he charged Balderas $4699 for the three months of treatment, and that the sum was a reasonable charge for the services rendered. Dr. Tran's billing record, which included dates of appointments, the services performed, and the charges for those services, was admitted into evidence.

¶ 8 Dr. Jeffery Chung, a medical expert retained by Starks, testified that the 2001 accident injured Balderas. Dr. Chung agreed with Dr. Tran that Balderas reached maximum medical improvement on April 3, 2001.

¶ 9 Dr. France, Starks's accident reconstructionist, testified that Starks's vehicle was traveling at three to eight miles per hour when it hit Balderas's car. He also testified that the change in velocity of Balderas's vehicle generated by the collision was between 1.6 and 4.3 miles per hour. Dr. France based his calculations on interviews with Balderas and Starks about their positions in the vehicles at the time of the crash,

---

1. At eight percent, Balderas's condition would     have actually improved after the 2001 accident.

how the vehicles rested after the crash, and the damage to their vehicles. Dr. France also looked at the repair estimate for Balderas's vehicle and photographs of the vehicles after they collided. He consulted literature and databases, including a compilation from the Insurance Institute for Highway Safety, that contained information about the model and make of the vehicles that were involved in the accident. Dr. France did not personally examine either of the cars. Once he looked at these factors and calculated the impact speed and change of velocity, Dr. France testified that he examined literature that documented the response of human subjects in rear-end collisions similar to what happened in this case. He also used a computer program named PC Crash that calculates momentum. Dr. France testified his methodology demonstrated a low probability that anyone in the general population could have been injured in the accident. He conceded, however, that Balderas's 1999 accident could have increased his chances of injury in the 2001 collision.

¶ 10 In closing arguments, Balderas's attorney asked for up to $60,000 in general and special damages. He argued that, at a minimum, Balderas should receive $5086.60, $4699 for treatment by Dr. Tran and $387.60 for expenses related to traveling to his appointments with Dr. Tran.

¶ 11 The jury found that Starks was negligent and that his negligence was a proximate cause of Balderas's injuries. But rather than awarding the highest amount asked for, the jury awarded $3237 in special damages for Balderas's chiropractic treatment. The jury awarded no general damages. When the verdict was read, Balderas's counsel objected, arguing that the jury was required to award some amount of general damages if it awarded special damages. The trial court agreed and resubmitted the verdict form to the jury with the following instruction:

Ladies and gentlemen, the attorneys have pointed [out] correctly that there is a small error in this matter. Once the jury has reached a verdict and has decided that it has found special and general damages, you must award something for general damages. Any amount is sufficient to satisfy what the law requires. So you have to reach some decision on that second portion.

Balderas's counsel did not object to this instruction. The jury returned with a nominal award of $1.00 for general damages.[2] Balderas's counsel did not object to this award or request further instructions to or corrections by the jury.

¶ 12 Balderas subsequently filed a motion for a new trial[3] under rule 59(a) of the Utah Rules of Civil Procedure, arguing that the damage award was inadequate, unsupported by the evidence, and influenced by passion and prejudice. See Utah R. Civ. P. 59(a). The court denied the motion. Balderas appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 The first issue on appeal is whether the trial court erred by refusing to order additur or grant a new trial. We review the trial court's decision on a motion for a new trial for an abuse of discretion. See Crookston v. Fire Ins. Exch., 817 P.2d 789, 805 (Utah 1991). We reverse "only if there is no reasonable basis for the decision." Id. The second issue is whether the testimony of Dr. France was admitted without proper foundation. We review the trial court's decisions regarding the admission of expert witness testimony for an abuse of discretion. See In re G.B., 2002 UT App 270, ¶ 10, 53 P.3d 963.

## ANALYSIS

### I. Balderas's Challenges to the Damage Awards

¶ 14 Balderas proffers two grounds in support of his argument that he should have

---

2. See Foote v. Clark, 962 P.2d 52, 57 (Utah 1998) (defining nominal damages as a "trivial sum such as one cent or one dollar awarded to a plaintiff whose legal right has been invaded but who has failed to prove any compensatory damages" (quotations and citation omitted)).

3. The motion asked, in the alternative, for additur, stating, "While the court could arguably correct this injustice [of inadequate damages] with a significant additur, the better remedy would be to grant a new trial and try the issue of damages anew."

a new trial on damages. First, he asserts that the jury's award of general damages was inconsistent with its award of special damages. Second, he argues that the jury verdict was inadequate and unsupported by the evidence. We address each contention in turn.[4]

### A. Inconsistency of the Damage Awards

¶ 15 Balderas argues that "[b]y awarding $3,237.00, the jury must necessarily have found that Starks was responsible, and that Balderas had been injured. Consequently, the jury's award of $1.00 as nominal damages for pain and suffering is inherently inconsistent with the special damages award."

■ ¶ 16 As a general rule, it is improper for a jury to award special damages without awarding any general damages.[5] In *Langton v. International Transport Inc.*, the Utah Supreme Court stated that "it must be conceded that if plaintiff were entitled to an award of special damages, he was entitled to be compensated . . . for pain and suffering." 26 Utah 2d 452, 491 P.2d 1211, 1214 (1971); *see also Kumorek v. Moyers*, 203 Ill.App.3d 908, 148 Ill.Dec. 906, 561 N.E.2d 212, 215 (1990) (holding that jury verdict was inconsistent where plaintiffs were "compensated for the full amount of their expenses for medical treatment, . . . but were awarded nothing for pain and suffering"); *Wright v. Jackson*, 329 S.W.2d 560, 561 (Ky.Ct.App.1959) (stating that where jury had awarded $202 for medical expenses, jury "would be required to make some award for pain and suffering"); *DeWitty v. Decker*, 383 P.2d 734, 736 (Wyo. 1963) (citing cases and stating that "[a]s a

general rule, the failure of a jury to award general damages, in the face of an award for substantial medical and hospital expense, results at least in an improper or irregular verdict"). Thus, the trial court in this case correctly resubmitted the verdict form after the jury awarded special damages but no general damages.

■ ¶ 17 We are unaware of any binding authority, however, addressing the specific question raised by this case, which is the propriety of a jury verdict that awards special damages, and only nominal general damages. Nevertheless, we do not resolve this narrow question because Balderas did not preserve this argument for appeal.

■ ¶ 18 "It is the rule in Utah that a failure to object to a verdict, informal or insufficient on its face, before the jury is discharged constitutes a waiver of the objection." *Ute–Cal Land Dev. Corp. v. Sather*, 605 P.2d 1240, 1247 (Utah 1980) (quoting Utah Rule of Civil Procedure 47(s),[6] which states that "[i]f the verdict rendered is informal or insufficient, it may be corrected by the jury under the advice of the court, or the jury may be sent out again," Utah R. Civ. P. 47(s), and noting that it is objecting counsel's duty to invoke this rule). This is not some hypertechnical requirement. Rather, "[t]he rule requiring an objection if there is some ambiguity serves the objective of avoiding the expense and additional time for a new trial by having the jury which heard the facts clarify the ambiguity while it is able to do so." *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1083 (Utah 1985). Waiver has been applied, in cases similar to the

---

4. These two arguments are distinct. While a new trial must be granted if an inadequate or unsupported verdict is reached, the contention that a verdict is irregular or inconsistent may be waived if not preserved by a proper objection while the jury is still empaneled. *See Langton v. International Transp., Inc.*, 26 Utah 2d 452, 491 P.2d 1211, 1215 (1971).

5. General damages, or damages for pain and suffering, are defined as the "immediate, direct, and proximate result, or such as necessarily result from the injury, or such as did in fact result from the wrong, directly and proximately." *Black's Law Dictionary* 271 (6th ed.1991). By comparison, special damages, such as compensa-

tion for medical treatment, are defined as "the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case, that is, by reason of special circumstances or conditions." *Id.* at 273.

6. At the time that *Ute–Cal Land Development Corp. v. Sather*, 605 P.2d 1240 (Utah 1980), was decided, this provision was designated as rule 47(r) of the Utah Rules of Civil Procedure and is referred to in the case as such. *See id.* at 1247. This provision was redesignated as rule 47(s) in a 2003 amendment, *see* Utah R. Civ. P. 47 amendment notes, but the language of the current rule is identical.

present case, to bar a party from appealing a verdict in which the jury awarded special damages but no general damages. *See Langton*, 491 P.2d at 1215; *see also Wright*, 329 S.W.2d at 561–62; *DeWitty*, 383 P.2d at 738–40.

¶ 19 In this case, we acknowledge that Balderas's counsel asked to have the jury sent back out after it awarded no general damages. However, if counsel continued to believe the revised damage award of $1.00 was contrary to law, as claimed on appeal, counsel should have objected again when the new verdict was read. Counsel did not object to the nominal damage award after it was read or at any other time before the jury was discharged. Nor did counsel object when the court instructed the jury that it could award *"[a]ny amount"* of general damages to make the verdict consistent. (Emphasis added.) Understandably, the jury likely believed that it was acting consistently with the instruction when it awarded a nominal sum. *See Wright*, 329 S.W.2d at 561–62 (stating that counsel should have objected to instruction that contained the phrase "if any" after each category of damages, because the instruction led the jury to believe it had "the right to grant or deny" both general and special damages (emphasis omitted)). For these reasons, we hold that Balderas has waived his right to argue on appeal that the jury verdict, as once revisited, was impermissibly inconsistent.[7]

### B. Insufficiency of Evidence Supporting the Damage Awards

¶ 20 Balderas next contends that there was insufficient evidence to support the special damage award of $3237 because the "only evidence was that Balderas incurred medical expenses in the sum of $4,699.00." Balderas's motion for a new trial was based on rule 59(a)(5) of the Utah Rules of Civil Procedure, which allows for a new trial when the verdict includes "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice," and rule 59(a)(6), which allows for a new trial when there is "[i]nsufficiency of the evidence to justify the verdict." Utah R. Civ. P. 59(a)(5)-(6).

¶ 21 Because he is arguing insufficiency of the evidence on appeal, Balderas "has the heavy burden of marshaling the evidence in support of the verdict and showing that the evidence, viewed in the light most favorable to the verdict, is insufficient." *Tingey v. Christensen*, 1999 UT 68,¶ 7, 987 P.2d 588. "After constructing [a] magnificent array of supporting evidence, [Balderas] must ferret out a fatal flaw in the evidence." *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct.App.1991).

¶ 22 Balderas has recognized this marshaling requirement and has attempted to fulfill it in his brief. However, he does not point out a "fatal flaw" showing that the evidence was insufficient. *Id.* Instead, Balderas cites *Nelson v. Trujillo*, 657 P.2d 730 (Utah 1982), in which the Utah Supreme Court held that the trial court improperly instructed the jury that it could award damages for the plaintiff's loss of future earnings. *See id.* at 735. The supreme court stated that the trial court erred because there was *"no evidence* upon which a jury could reasonably base such an award." *Id.* (emphasis added).

¶ 23 Unlike *Trujillo*, there is evidence in this case to support the reduced damage award. The jury heard evidence that Balderas drove thirty miles each way to see Dr. Tran, and the jury could have determined that the travel expenses were not warranted. The jury also heard evidence about the 1999 accident and could have concluded that not all of the treatment Dr. Tran recorded in his billing ledger was a result of the 2001 accident. The jury also could have considered the evidence that Balderas did not mention the 2001 accident to Dr. Moore and initially actually received a better total body impairment rating from Dr. Tran after the second accident. Furthermore, both Dr. Tran and Dr. Chung relied upon Balderas's subjective assessment of the intensity of his pain in forming their opinions concerning when Balderas reached maximum medical improvement. The jury was free to form its

---

7. By deciding this issue on the basis of waiver, we do not conclude that there is anything inherently impermissible about an award of nominal general damages.

own opinion as to the accuracy of Balderas's statements to the doctors.

¶ 24 In addition, the jury was entitled to carefully weigh the testimony of the witnesses and the other evidence, and in fact was instructed to do so.[8] The jury was not required to adopt Balderas's damage theory wholesale. In *Even Odds, Inc. v. Nielson*, 22 Utah 2d 49, 448 P.2d 709 (1968), the Utah Supreme Court stated:

> [T]he fact-trier should not be permitted to arbitrarily ignore competent, credible[,] and uncontradicted evidence. Nevertheless, [the jury] *is not bound to slavishly follow the evidence and the figures given by any particular witness.* Within the limits of reason it is [the jury's] prerogative to place [its] own appraisal upon the evidence which impresses [it] as credible and to draw conclusions therefrom in accordance with [its] own best judgment.

*Id.* at 712 (emphasis added); *see also Arnold Mach. Co. v. Intrusion Prepakt, Inc.*, 11 Utah 2d 246, 357 P.2d 496, 497 (1960) (stating that "the jury was not obliged to follow abjectly the plaintiff's evidence, but had the right to place [its] evaluation upon . . . the witnesses and the weight of the evidence" in awarding $2500 in damages rather than the $3580.52 plaintiff requested).

¶ 25 In sum, the trial court did not err in refusing to grant a new trial or additur. We cannot say the jury award proves that the jury acted out of passion or prejudice. Rather, the verdict is supported by sufficient evidence.

## II. Balderas's Challenge to Dr. France's Testimony

¶ 26 Balderas maintains that the trial court erred in allowing Dr. France to testify about the impact speed of the 2001 accident, the change in velocity, and the likelihood of a resultant injury. Specifically, Balderas contends that the methods used by Dr. France,

including reconstruction of the accident without personally examining the vehicles, were inherently unreliable under *State v. Rimmasch*, 775 P.2d 388 (Utah 1989). He also asserts that the trial court did not allow adequate questioning of Dr. France during the hearing conducted pursuant to rule 104(a) of the Utah Rules of Evidence. *See* Utah R. Evid. 104(a).[9] We disagree, primarily because we conclude that Balderas is mistaken in relying upon *Rimmasch*.

¶ 27 "The trial court has wide discretion in determining the admissibility of expert testimony," and "we will not reverse unless the decision exceeds the limits of reasonability." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). The admissibility of expert testimony is generally governed by rules 701 through 704 of the Utah Rules of Evidence. *See id.* Utah Rule of Evidence 702 provides the parameters for admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Utah R. Evid. 702. The ultimate question that must be answered before expert testimony can be admitted is whether, "on balance, the evidence will be helpful to the finder of fact." *Larsen*, 865 P.2d at 1361 (quotations and citation omitted). Expert testimony is helpful when the subject is not within "the knowledge or experience of the average individual." *Id.*

¶ 28 The trial court is required to apply the inherent reliability test of *Rimmasch* only when there is a "plausible claim," *Haupt v. Heaps*, 2005 UT App 436, ¶ 19, 131 P.3d 252, *cert. denied*, 132 P.3d 683 (Utah 2006), that the expert testimony sought to be

---

8. The court told the jurors:

   You are the exclusive judges of the credibility of the witnesses and the weight of the evidence. In judging the weight of the testimony and the credibility of the witnesses, you have the right to take into consideration their bias, their interests and the result of the suit or any

probable motive or lack thereof to testify fairly, if any is shown.

9. In relevant part, Utah Rule of Evidence 104(a) states: "Preliminary questions concerning the qualification of a person to be a witness, . . . or the admissibility of evidence shall be determined by the court. . . ." Utah R. Evid. 104(a).

admitted is based on "novel scientific principles or techniques." *Green v. Louder,* 2001 UT 62, ¶ 27, 29 P.3d 638; *see also Alder v. Bayer Corp.,* 2002 UT 115, ¶¶ 62, 66, 61 P.3d 1068 (holding that *Rimmasch* was not implicated by expert testimony based on differential diagnosis, which is "one of the oldest and most widely used and recognized of all the methods"); *State v. Adams,* 2000 UT 42, ¶ 16, 5 P.3d 642 (holding that *Rimmasch* was inapplicable to tests that had been used "since the 1950's" to determine mental capacity); *State v. Kelley,* 2000 UT 41, ¶ 19, 1 P.3d 546 (holding that *Rimmasch* was inapplicable because no plausible claim that I.Q. tests were novel science).[10]

■■■ ¶ 29 When expert testimony does not require evaluation under the inherent reliability test announced in *Rimmasch,* we evaluate the testimony according to the standard set forth in *State v. Clayton,* 646 P.2d 723 (Utah 1982):

> [O]nce the expert is qualified by the court, the witness may base his opinion on reports, writings[,] or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field. The opposing party may challenge the suitability or reliability of such materials on cross-examination, but such challenge goes to the weight to be given the testimony, not to its admissibility.

*Id.* at 726; *see Kelley,* 2000 UT 41 at ¶ 20, 1 P.3d 546; *see also* Utah R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.").

■■■ ¶ 30 In this case, Balderas does not have a "plausible claim" that the testimony of Dr. France was based on novel scientific principles or techniques. His argument, in fact, is essentially foreclosed by *Green,* in which the Utah Supreme Court held that the testimony of an accident reconstructionist who, similar to Dr. France, employed a computer program to perform mathematical computations, was "certainly not based on novel scientific principles or techniques." 2001 UT 62 at ¶ 27, 29 P.3d 638. The *Green* court noted testimony that "computer programs are universally used by accident reconstructionists as a means to corroborate the accuracy of their findings." *Id.* at ¶ 26. *Green* underscores that for decades, accident reconstructionists employing techniques similar to those of Dr. France have been allowed to render expert opinions. Therefore, Balderas does not have a plausible claim that *Rimmasch* should apply. We therefore evaluate Dr. France's testimony under the standard set forth in *Clayton:* "[T]he witness may base his opinion on reports, writings[,] or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field." 646 P.2d at 726. Here, Dr. France's opinion was based on reports, writings, databases, and techniques universally used by accident reconstructionists. *See Green,* 2001 UT 62 at ¶ 26, 29 P.3d 638.

¶ 31 We are unpersuaded by Balderas's argument that Dr. France should not have been allowed to testify because he relied upon photographs of the vehicles after the collision but did not personally view the automobiles. *Clayton* does not impose a requirement of personal observation, but rather

---

**10.** At trial, Balderas submitted as evidence a study by the Society of Automotive Engineers. Participants in this study were asked to evaluate the crush depth of a vehicle based on one or two photographs and no other information. The study noted that "reconstructionists are occasionally asked to determine deformation depths from one or more photographs," and then concluded by stating that "[m]ost of the participants in this exercise reported that they would not attempt to use information generated in this fashion in a reconstruction without additional details." There is nothing in the study introduced by Balderas that makes actual inspection of the vehicles a prerequisite to rendering an opinion. Further, Dr. France did not rely solely on photographs but based his opinion on other data as well. Thus, we are unpersuaded that this study demonstrates that Balderas raised a "plausible claim" that Dr. France's techniques were based on novel scientific principles or techniques. Furthermore, the study's reference to reconstructionists occasionally being asked to reach conclusions solely from photographs undermines the assertion that either the method or science is novel.

states that an opinion may be based on "reports, writings[,] *or* observations." 646 P.2d at 726 (emphasis added). Nor does rule 703 contain such a mandate, but rather only requires that an expert opinion be based on facts or data "perceived by *or* made known to the expert." Utah R. Evid. 703 (emphasis added); *see Kelley,* 2000 UT 41 at ¶ 23, 1 P.3d 546 (holding that expert could testify about I.Q. test even though he did not conduct the test himself, and noting that "under [Utah] case law, it is not necessary for experts to have perceived all aspects of their testimony personally"); *see also Gorman v. Hunt,* 19 S.W.3d 662, 670 (Ky.2000) (holding that expert could testify about position of vehicles at time of impact even though he had not personally viewed scuff marks, because he relied on testimony of investigating officer); *Tobeck v. United Nuclear–Homestake Partners,* 85 N.M. 431, 512 P.2d 1267, 1273 (Ct.App.1973) (holding that expert had proper foundation to testify because his opinion was based, in part, on "photographs of the scene of the accident and the vehicles involved").[11]

¶ 32 Balderas also argues that he was not allowed to fully cross-examine Dr. France at the rule 104(a) hearing. He asserts that because the trial court prematurely ended his examination, he was unable to establish that Dr. France's methodology had not been tested for accuracy, had not been peer reviewed, and merely allowed Dr. France to provide an "educated guess." We determine, however, that these inquiries are not helpful to the *Clayton* analysis and would only be relevant if *Rimmasch* were applicable to this case. *See State v. Rimmasch,* 775 P.2d 388, 403 (Utah 1989) (stating that to provide founda-

tion for novel scientific principles, the court should explore such questions as "the correctness of the scientific principles underlying the testimony" and "the accuracy and reliability of the techniques utilized in applying the principles to the subject matter"). Because we have already concluded that *Rimmasch* is not applicable, the trial court did not err in declining to examine these issues. We cannot find that the trial court abused its discretion in admitting the testimony of Dr. France or in limiting the extent of Balderas's preliminary examination of Dr. France.[12]

## CONCLUSION

¶ 33 The trial court did not err in denying Balderas's motion for additur or a new trial. Balderas waived his argument that the award of special damages was inconsistent with the nominal general damages award, and the award of special damages was supported by sufficient evidence. Additionally, Dr. France's testimony was not subject to the inherent reliability test of *Rimmasch* and the trial court did not abuse its discretion by allowing its admission. We affirm.

¶ 34 WE CONCUR: JUDITH M. BILLINGS and GREGORY K. ORME, Judges.

---

11. Balderas relies on *Tittsworth v. Robinson,* 252 Va. 151, 475 S.E.2d 261 (1996), to support his contention that personal observation of the vehicles was required. In *Tittsworth,* the Virginia Supreme Court held an accident reconstructionist's testimony was inadmissible, in part, because the expert had not personally viewed the vehicles. *See id.* at 263–64. However, *Tittsworth* is distinguishable from this case for several reasons, for instance, because the expert assumed a half-inch of crush damage to the vehicles and because the tests upon which the expert relied focused on injuries not at issue in the case. *See id.* at 262–63. Moreover, *Tittsworth* applied the standard for admissibility of experts under Virginia law, which is different than that established

by either *State v. Clayton,* 646 P.2d 723 (Utah 1982), or *State v. Rimmasch,* 775 P.2d 388 (Utah 1989). *See Tittsworth,* 475 S.E.2d at 263.

12. Balderas also argues on appeal that we should find Dr. France's testimony inadmissible because it was irrelevant. He acknowledges that he did not raise this argument below and asks us to review this issue under the plain error doctrine. We decline to do so because we do not agree that it would have been plain to the trial court that the testimony was irrelevant, nor do we consider whether the testimony was in fact irrelevant.