AMICA MUTUAL INSURANCE COMPANY, Plaintiff and Respondent,

v.

Carl F. SCHETTLER, Defendant and Appellant,

Carl F. SCHETTLER, Third–Party Plaintiff and Appellant,

v.

James M. BLACK and Barbara J. Black d/b/a Black, Nichols & Guiver; R. Lamar Guiver; and National Automobile Theft Bureau, Third–Party Defendants and Respondents.

No. 870488–CA.

Court of Appeals of Utah.

Jan. 12, 1989.

Phil L. Hansen (argued), Salt Lake City, for Carl F. Schettler.

S. Baird Morgan (argued), Mark J. Taylor, Stephen J. Traynor, Strong and Hanni, Salt Lake City, for Amica Mut. Ins.

## OPINION

Before BILLINGS, JACKSON and ORME, JJ.

BILLINGS, Judge:

This case is before this Court as a consolidation of three appeals, Docket Nos. 870488–CA, 880032–CA, and 880038–CA. Generally, appellant Carl F. Schettler ("Schettler") appeals from a summary judgment dismissing his counterclaim and third-party complaints on the merits. Schettler also appeals the entry of his default as a sanction for failing to comply with court-ordered discovery and the awarding of compensatory and punitive damages to respondent, Amica Mutual Insurance Company ("Amica"). Finally, he appeals the trial court's refusal to set aside the default judgment. Schettler requests this Court to reverse all of the trial court's orders. We affirm the trial court's summa-

ry judgment order, entry of default judgment against Schettler, and refusal to set aside Schettler's default, but except to the extent of $6,925, we vacate the general damage award and the punitive damage award, and remand for further proceedings consistent with our opinion.

## FACTS

In July, 1981, a 1980 Dodge owned by Schettler and insured by Amica was damaged in an accident. As a result of the accident, Schettler's automobile was taken to Pioneer Dodge in Salt Lake City for repair. After repairs were completed, Schettler submitted a final bill to Amica, which Amica paid in full directly to Schettler.

In May, 1982, Schettler removed the automobile from Pioneer Dodge without Pioneer's authorization and without paying for the repair work. Several weeks later, Pioneer hired an independent tow service to recover possession of the automobile from Schettler's home in Salt Lake City.

On June 9, 1982, Schettler reported his automobile stolen to the Salt Lake County Sheriff's Department. Based on a conversation with Schettler, the reporting deputy listed no suspects in his police report.

Subsequently, Pioneer Dodge and Schettler exchanged several letters which indicated Pioneer had the automobile, and Schettler knew of this fact. On June 11, 1982, Schettler's attorney wrote a letter to Pioneer Dodge offering to negotiate payment for the repairs made by Pioneer. In another letter, the manager of Pioneer Dodge instructed Schettler to pick up his automobile by June 15, 1982, or Pioneer would assess storage costs. In a letter dated June 17, 1982, Pioneer notified Schettler that due to his failure to make payment, the automobile would be sold at a public auction. However, Schettler contends that both of Pioneer's letters were returned unclaimed due to an incorrect address.

Additionally, Pioneer Dodge's manager testified at Schettler's criminal trial that within "one or two days" after retaking

possession of the automobile, he received a telephone call from Schettler wherein Schettler identified himself as "Carl" and asked whether or not Pioneer Dodge had his automobile. Pioneer's manager responded, "Carl, you know we have your car." Schettler responded by hanging up.

On June 22, 1982, Schettler submitted a written claim to Amica for the loss of his automobile. On July 9, 1982, Amica issued a check in the amount of $6,925 in satisfaction of the total loss claimed by Schettler for his "stolen" automobile. Schettler accepted and negotiated the check as a complete settlement of his claim. In return, Schettler gave Amica the title to the 1980 Dodge.

Amica, by notice dated October 26, 1982, advised Schettler that his insurance would be cancelled for nonpayment of premiums effective November 8, 1982. No extension was requested by Schettler, and his contract of insurance with Amica was terminated on or about November 10, 1982.

On December 29, 1982, Detective Mortensen of the Salt Lake County Sheriff's Department notified Amica that the department had located Schettler's automobile and that Pioneer Dodge was selling the automobile at a public auction. The detective informed Amica that the sheriff's office had begun a criminal investigation as a result of the discovery.

Detective Mortensen also contacted third-party defendant, National Automobile Theft Bureau ("NATB"), a nation-wide service for locating stolen automobiles. NATB was notified because following Schettler's stolen automobile claim, Amica sent a written report to inform NATB that Schettler's automobile had been reported stolen.

After Amica received notice the automobile had been located, it contacted third-party defendant, Black, Nichols & Guiver[1] ("Black & Guiver"), its local adjusting agency, to investigate the matter.

Eventually, Schettler was arrested and charged with insurance fraud. On October 3, 1984, the Fifth Judicial Circuit Court conducted a preliminary hearing and determined that probable cause existed that Schettler had committed insurance fraud and, therefore, bound Schettler over for a criminal trial. A jury subsequently found Schettler not guilty.

## PROCEDURAL BACKGROUND

On April 26, 1985, Amica filed this action to recover the $6,925 paid to Schettler for the loss of his automobile plus punitive damages. In its amended complaint, Amica alleged fraud, misrepresentation, breach of contract, and conversion against Schettler based on the facts set forth above.

In response to Amica's complaint, Schettler filed a counterclaim against Amica and identical third-party complaints against Black & Guiver and NATB based on theories of insurer bad faith, malicious prosecution, abuse of process, defamation, intentional infliction of emotional distress, and negligence.

On November 3, 1986, the trial judge entered its order granting Amica's, Black & Guiver's, and NATB's motions for summary judgment dismissing Schettler's counterclaim and third-party complaints. The trial judge also granted Amica's motion to strike various affidavits apparently submitted in opposition to the motions for summary judgment.[2]

On November 4, 1986, Schettler moved for summary judgment on Amica's com-

---

1. In response to Amica's complaint, Schettler joined as third-party defendants, James Black and Barbara Black, d/b/a Black, Nichols & Guiver, and Lamar Guiver, an ex-employee of the same. By stipulation of the parties, Barbara Black was dismissed from this action, and the remaining parties, James Black and Lamar Guiver, are referred to collectively as "Black & Guiver" throughout this opinion.

2. At the time the trial court considered the parties' motions for summary judgment, Amica had also filed a motion for sanctions on the grounds of attorney and client misconduct. In response to the various motions, Schettler filed seven affidavits. It is not clear from the record whether these affidavits were filed in opposition to the motions for summary judgment or the motion for sanctions.

plaint. This motion was denied on January 5, 1987.

On November 6, 1986, Amica filed a motion to compel production of documents and answers to interrogatories, originally requested in March of 1986. Amica's earlier discovery requested personal state and federal tax returns, personal and business financial records, flooring agreements, correspondence, business reports, copies of tape recordings, personal and business net worth statements, and balance sheets. Amica claimed that most of the documents were relevant to the recovery of punitive damages.

On December 1, 1986, Schettler served Amica with his response to Amica's request for production of documents principally consisting of an application for extension of time to file his 1984 federal tax return, four personal financial statements prepared for various financial institutions, and one residential property appraisal of Schettler's home.

In its order dated January 5, 1987, after finding Schettler's response unsatisfactory, the court directed Schettler to fully respond to Amica's discovery request within two weeks. Schettler made no further response. Consequently, on January 28, 1987, Amica moved for sanctions pursuant to Rule 37(b) of the Utah Rules of Civil Procedure for Schettler's failure to comply with the court's discovery order.

Schettler did not file a response to Amica's motion for sanctions. On February 23, 1987, the trial court struck Schettler's answer to Amica's complaint and entered his default on the grounds that no justifiable excuse was offered by Schettler for his failure to comply with the court's discovery order. In its February 23 order, the court preserved the original March 10 trial date but limited the issue to the damages to be awarded Amica on its complaint.

On February 25, 1987, Amica withdrew its original demand for a jury trial, and requested a fact-finding hearing on the issue of damages pursuant to Rule 55(b)(2) of the Utah Rules of Civil Procedure. Amica contended the entry of default vitiated the need for a jury trial. Schettler disa-greed and on March 3, 1987, demanded a jury trial on the issue of damages.

On March 10, 1987, the trial court denied Schettler's jury demand, and instructed the parties to submit affidavits on the issue of damages. Amica submitted its memorandum, supporting affidavits, and excerpts from depositions to support its request for damages. Amica's response consisted of over 200 pages which included the affidavit of Ronald Rosenthal, Amica's representative, substantiating that the attorney fees paid to date on the case were $79,548.10.

In response to Amica's affidavits, Schettler submitted his memorandum in opposition and one affidavit by Phil Hansen, his current attorney, asserting that attorney fees were not recoverable as damages and that the punitive damages and attorney fees claimed were excessive.

The following evidence was also before the trial court at the time it considered both the entry of default as a sanction and the amount of general and punitive damages: (1) Schettler's attorney, Ed Flint, misrepresented himself to Pioneer Dodge's manager as an attorney for an insurance company in a dispute with Schettler; (2) a court reporter testified that Schettler attempted to intimidate witnesses Mr. and Mrs. Reuel Ware at their depositions by threatening litigation on a prescriptive easement if they testified; (3) attorney, Ed Flint, attempted to intimidate witnesses Mr. and Mrs. Smith to prevent them from giving their depositions in the case; (4) both Schettler and Flint engaged in regular secretive taping of phone conversations with adverse counsel and witnesses during the course of the litigation; (5) Schettler and Flint attempted to intimidate witness Troy Murdock by coercing him to leave a restaurant parking lot with them and forcing him to sign an affidavit. They also offered Murdock $1,000 if he agreed not to appear at his deposition and $10,000 if he agreed to solicit a bribe from Amica's attorney; and (6) attorney, Ed Flint, attempted to further intimidate Troy Murdock by brandishing a revolver he kept in his brief-

case.[3]

The trial court, after considering the parties' affidavits and memoranda, issued its memorandum decision dated April 23, 1987. The court awarded $98,579.24 as general damages which included $6,925, the amount Amica paid Schettler for his automobile, approximately $12,106.14 as costs, and $79,548.10 in attorney fees. The court further awarded Amica $100,000 as punitive damages.

On May 6, 1987, the trial court entered its final judgment and made findings of fact and conclusions of law, which read in pertinent part:

1. The court is of the opinion that defendant, Carl F. Schettler, committed fraud as alleged in plaintiff's complaint and such facts as otherwise pleaded in plaintiff's complaint are established by reason of the court's prior order striking defendant's answer and entering his default.

2. The court further finds that subsequent to plaintiff initiating this action defendant in the defense of this case engaged in activities both individually and through counsel which the court finds are reprehensible, inexcusable and of sufficient gravity to warrant both general and punitive damages as a warning to defendant and others that such behavior would not be tolerated by society.

3. The court further finds that the actions of defendant and defendant's counsel engaged in during the court [sic] of litigation of this matter have been of a very dangerous nature and with complete disregard to the rights

of others and designed in their ultimate purpose to influence imporperly [sic] the decision of this court.

4. The court further finds that general damages are reasonable and proper in favor of plaintiff and against defendant in the amount of $98,579.24 to compensate plaintiff for sums actually lost due to defendant's fraud and other misconduct.

5. The court further finds that punitive damages are reasonable and proper given the conduct of defendant in the amount of $100,000.00.

On June 4, 1987, Schettler filed three motions. First, he filed a motion for a new trial on the grounds of newly discovered evidence. Second, Schettler filed a motion for relief from final judgment pursuant to Rule 60(b) of the Utah Rules of Civil Procedure based on the same newly discovered evidence. Finally, Schettler requested a 30–day extension of time to file an appeal from the entry of final judgment dated May 6, 1987. The motion to extend his time for appeal was granted June 5, 1987.

On June 24, 1987, after reviewing the file including two affidavits submitted by Schettler, the trial court denied Schettler's motion for a new trial and his motion to set aside judgment.

On July 9, 1987, Schettler filed a *second* motion pursuant to Rules 55(c) and 60(b), to set aside the default judgment entered May 6, 1987. On August 17, 1987, the trial court denied Schettler's second motion. On September 14, 1987, Schettler appealed the trial court's denial of his second motion to set aside the default judgment.[4]

---

**3.** This conduct by Schettler and his counsel were the subject of an earlier motion for sanctions which was heard in connection with Amica's motion for summary judgment in August, 1986. At that time, Schettler submitted several affidavits to refute the allegations of witness tampering with Troy Murdock. *See infra* note 5. The affidavits were stricken by the lower court and Schettler has failed to raise this issue in any of his *numerous* notices of appeal. In its order, dated October 31, 1986, the trial court reserved its ruling on the first request for sanctions.

**4.** In this case there are five notices of appeal in the record. Appeal number 1 dated November

20, 1986, appeals the lower court's order granting cross and counterclaim defendants' motions for summary judgment. Appeal number 2, dated January 15, 1987, challenges the trial court's January 5, 1987 order denying his motion for summary judgment. Appeal number 3, dated April 9, 1987, appeals the trial court's March 10, 1987 order denying his jury demand and providing for the filing of affidavits on the issue of damages. Appeal number 4, dated July 6, 1987, contests 1) the order denying his motion for summary judgment, 2) the February 23, 1987 order striking his answer and entering default, 3) the March 10, 1987 order denying Schettler's demand for a jury trial and submitting the issue

## I.

### SUMMARY JUDGMENT DISMISSING SCHETTLER'S COUNTERCLAIM AND THIRD–PARTY COMPLAINTS

#### Standard of Review

"In reviewing a summary judgment, we apply the analytical standard required of the trial court. We liberally construe the facts and view the evidence in a light most favorable to the party opposing the motion." *Lucky Seven Rodeo Corp. v. Clark,* 755 P.2d 750, 752 (Utah Ct.App.1988) (citation omitted). If, upon a review of the record, it appears there is a dispute as to a material factual issue, we are compelled to reverse the trial court's determination and remand for further proceedings on that issue. *Id.* One sworn statement under oath is all that is necessary to create a factual issue, thereby precluding the entry of summary judgment. *Id.* However, when the moving party has presented evidence sufficient to support a judgment in its favor, and the opposing party fails to submit contrary evidence, a trial court is justified in concluding that no genuine issue of fact is present or would be at trial.

*Dupler v. Yates,* 10 Utah 2d 251, 351 P.2d 624, 636–37 (1960). Therefore, we must determine if the facts properly before the trial court demonstrate that no material factual issues existed with respect to Schettler's claims for, (1) insurer bad faith, (2) malicious prosecution, (3) abuse of process, (4) defamation, (5) intentional infliction of emotional distress, and (6) negligence.[5]

The Rules of the Utah Court of Appeals provide that "all statements of fact and references to the proceedings below shall be supported by citations to the record." Utah R.Ct.App. 24(a). Therefore, we only consider those facts properly cited to and supported by the record.[6]

#### Insurer Bad Faith

■ Schettler alleged insurer bad faith against all of the parties. We find the claim against NATB and Black & Guiver without merit. There are no facts to establish (1) that a contractual relationship ever existed between Schettler and NATB or between Schettler and Black & Guiver, or (2) that the third-party defendants owe

---

of damages on affidavits, and 4) the amounts awarded for both general and punitive damages. Schettler filed his fifth and final notice of appeal on September 14, 1987.

5. In opposition to Amica's motion for summary judgment, Schettler filed seven affidavits. *See supra* notes 2–3. Five of the seven affidavits were irrelevant to the motion for summary judgment and related only to Amica's motion for sanctions. Generally, the five affidavits allege that Troy Murdock attempted to extort money from Schettler and his attorney, and threatened to perjure his testimony in a deposition scheduled to be taken by Amica. The trial court struck all seven affidavits. Affidavits submitted to defeat a motion for summary judgment must be based on personal knowledge, set forth facts that would be admissible at trial, and affirmatively demonstrate that the affiant is competent to testify to the matters stated therein. Utah R.Civ.P. 56(e). *See also Salt Lake City Corp. v. James Constructors, Inc.,* 761 P.2d 42, 45–46 (Utah Ct.App.1988).

After reviewing the seven affidavits, we find the trial court properly struck five of the seven. We further conclude that the court's order striking the affidavits of Jim Hansen and Elizabeth Stewart is harmless error in that these affidavits did not raise material factual issues. *See* Utah R.Civ.P. 61.

6. We note that Schettler's briefs are seriously deficient in addressing the complexities of this case. In a case such as this, where appellant has raised a number of procedural and substantive issues, it is imperative that counsel abide by the rules of appellate procedure. This Court, as well as the Utah Supreme Court, has stated on a number of occasions that failure to properly cite to the record or otherwise comply with the rules of appellate procedure provides an independent basis for affirming the trial court's determinations. *See, e.g., Trees v. Lewis,* 738 P.2d 612–13 (Utah 1987); *State v. Pursifull,* 751 P.2d 825, 825 (Utah Ct.App.1988). Although we proceed to the merits, it was a close question as to whether we should simply affirm based on the inadequacy of Schettler's briefs. Nevertheless, "[c]ounsel should be aware that appellate courts are beginning to overcome their trepidation about dismissing appeals and imposing sanctions for failure to comply with these procedures." *Demetropoulos v. Vreeken,* 754 P.2d 960, 961 (Utah Ct.App.1988), *cert. denied,* 765 P.2d 1278 (1988). " '[Courts] can no longer afford the effort and time to prepare counsels' case and to supply counsels' record deficiencies,' [citation omitted] when this time can be 'better spent in considering the merits of cases that are presented to us in proper form....' " *Id.* at 962.

Schettler an independent duty outside a contractual relationship. Therefore, we analyze this cause of action only as it relates to Amica.

The Utah Supreme Court has held that "in a first-party relationship between an insurer and its insured, the duties and obligations of the parties are contractual" thus, a breach of those express or implied duties gives rise to a cause of action in contract; and not one in tort. *Beck v. Farmer's Ins. Exch.*, 701 P.2d 795, 800 (Utah 1985). *See also Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 842 (Utah Ct. App.1987). Additionally, the Court stated that the *implied* obligation of good faith performance contemplates, at the very least, that an insurer will (1) diligently investigate the facts of every claim to determine its validity; (2) fairly evaluate a claim; and (3) act promptly and reasonably in rejecting or settling a claim. *Beck,* 701 P.2d at 801 (citations omitted).

Schettler admits that both his claim for the damage to his automobile as a result of the accident, and his claim for the "theft" of his automobile were satisfactorily settled. Schettler's allegations of "bad faith" relate solely to acts by Amica occurring after November 10, 1982, the date Amica cancelled his policy for failure to pay the premiums.

In order to maintain an action under a contractual theory of insurer bad faith, the parties must be in privity of contract at the time of the alleged wrong. *Ammerman v. Farmers Ins. Exch.,* 19 Utah 2d 261, 430 P.2d 576, 577 (1967). *See also Allstate Ins. Co. v. Amick,* 680 P.2d 362, 364 (Okla.1984) (duty of insurer good faith arises from the contractual relationship and in the absence of such a relationship, there is no duty which can be breached). However, even assuming Amica owed Schettler a continuing duty to act in good faith after the policy was cancelled, based on the undisputed facts properly before the trial court, the duty was not breached. In *Callioux v. Progressive Ins. Co.,* 745 P.2d 838 (Utah Ct.App.1987), a case factually similar to this case, we upheld the trial court's summary judgment dismissing plaintiff's claim

of insurer bad faith. In *Callioux,* the insured filed a claim under his insurance policy for the loss of his automobile, alleging that the automobile was destroyed by fire when it rolled down a hill and burned. The insurer conducted its own investigation and concluded that the automobile was destroyed by arson, and accordingly, denied the claim. The insurer also reported the incident to the State Fire Marshall, pursuant to statute. The State Fire Marshall reported his findings to the county attorney and charges were eventually filed against the insured for arson and attempted insurance fraud.

After a finding of probable cause, the insured in *Callioux,* was bound over for trial. A jury found him not guilty. The insurer then paid the insured's claim in full. Thereafter, the insured instituted a civil proceeding against the insurer alleging bad faith in denying his claim. Although Schettler has not asserted a bad faith denial of a claim, he contends that Amica acted in bad faith by assisting the county attorney in his efforts to prosecute Schettler and by bringing this civil action, notwithstanding Schettler's acquittal of insurance fraud in the criminal action.

Schettler's position is not persuasive. First, the record clearly demonstrates that Detective Mortensen requested assistance and information from Amica to aid in his investigation. Amica complied with those requests, and it simply cannot be said that cooperating with law enforcement efforts constitutes bad faith conduct. Second, Schettler's allegation concerning the impropriety of Amica bringing this civil action is also unfounded. As we recently held in *Callioux,* " '[w]hen a claim is fairly debatable, the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.' " 745 P.2d at 842 (citation omitted). Therefore, even assuming Amica had a continuing duty to act in good faith toward Schettler, we conclude that Schettler could not establish that Amica breached its duty. Schettler's insurer bad faith claim against Amica was properly dismissed.

## Malicious Prosecution

█ In order to successfully maintain a claim for malicious prosecution, a party must establish four elements: "(1) A criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the accused; (3) absence of probable cause for the proceeding; [and] (4) 'malice,' or a primary purpose other than that of bringing an offender to justice." *Callioux v. Progressive Ins. Co.*, 745 P.2d 838, 843 (Utah Ct.App.1987) (citing W. Prosser & W. Keeton, *Law of Torts* § 119 (5th ed. 1984)). The failure to establish any one of the four elements is fatal to the cause of action. *Id.*

Schettler's claim fails for three reasons. First, he has not established that the cross or counterclaim defendants instituted or continued the criminal proceeding against him. Second, he has failed to demonstrate that there was an absence of probable cause, and finally, Schettler has not identified conduct that rises to the level of malice. In fact, the only element Schettler has substantiated is that the criminal proceeding terminated in his favor.

To prove that a defendant instituted the criminal proceeding, a plaintiff must show that the defendant was "actively instrumental in putting the law in force." *Callioux*, 745 P.2d at 843 (quoting *Rose v. Whitbeck*, 277 Or. 791, 562 P.2d 188, 190 (1977)). There is no evidence that Amica, NATB, or Black & Guiver initiated the criminal investigation against Schettler. To the contrary, Schettler cites portions of the record establishing that the criminal investigation began before Amica was informed of the location of the "stolen" automobile.

In the alternative, Schettler maintains that once the investigation began, Amica, NATB, and Black & Guiver repeatedly contacted Detective Mortensen in an attempt to intimidate and improperly influence his decision to file charges. To support his position, Schettler cites to several interoffice memos and letters exchanged between cross and counterclaim defendants. The most potentially damaging of these letters states: "We still are unable to get this claim off dead center at the Sheriffs [sic] Office.... We are calling them at least twice a week and hope to get things going within the next ten days." These statements, taken in the proper context, simply reflect Amica's concern with the civil statute of limitations for filing an action against Schettler, and a consequent concern for the delay in the criminal proceedings caused, in part, by an auto accident involving the investigating detective.

Conversely, the affidavits of Detective Mortensen and Ernest Jones, the prosecuting county attorney, clearly establish that the decision to investigate and prosecute Schettler was made entirely by them. Based on their sworn statements and the absence of any controverting evidence, it is of no consequence in this case that cross and counterclaim defendants either contacted Detective Mortensen or provided him information. *See generally* W. Prosser & W. Keeton, *Law of Torts* § 119 at 872 n. 20 (5th ed. 1984). Because we find the trial judge correctly concluded that cross and counterclaim defendants did not institute or continue the criminal proceedings against Schettler, it is unnecessary to address the remaining elements of malicious prosecution as the absence of one is fatal to the cause of action. *Callioux*, 745 P.2d at 843.

## Abuse of Process

█ In his pleadings, Schettler attempts to allege both an abuse of the criminal and civil process. The latter is premature since it requires that the proceedings have terminated in favor of the person against whom they were brought. Restatement (Second) of Torts § 674(b) (1977). *See also Baird v. Intermountain School Fed. Credit Union*, 555 P.2d 877, 878 (Utah 1976).

█ An action for abuse of the criminal process has not been well defined in Utah, but the essence of the action "is a perversion of the process to accomplish some improper purpose, such as compelling its victim to do something which he would not otherwise be legally obligated to do." *Crease v. Pleasant Grove City*, 30 Utah 2d 451, 519 P.2d 888, 890 (1974). According to

the Restatement, one who uses the criminal process "against another primarily to accomplish a purpose for which it is not designed," may be subject to liability for any harm caused thereby. Restatement (Second) of Torts § 682 (1977). However, a criminal charge does not become an abuse of process merely because the accuser dislikes the accused or wishes him harm. *Id.* at comment b.

In *Crease*, the Utah Supreme Court declared if the criminal process is used for its intended purpose, "the mere fact that it has some other collateral effect" does not render the action an abuse of process. This is true "even though [the criminal action] may incidentally and indirectly exert pressure for the collection of a debt." *Crease*, 519 P.2d at 890 (footnote omitted).

Schettler claims Amica used the criminal process to force him to reimburse Amica for the money he received as a result of his "stolen" automobile claim. Schettler's only citation to the record to support his allegations is a memo that states:

> Mr. Black of Black, Nichols & Guiver is working with the Salt Lake City detectives, district attorney, and with the NATB representative.
>
> Things are still pretty much up in the air, but it seems certain that charges will be placed against the insured unless there is some change in the current thinking.
>
> As soon as things stabilize, Mr. Black will bring us up to date.
>
> Hopefully all this will result in the return of our payment.

Schettler's allegations are clearly insufficient to maintain a claim for abuse of process. As discussed in detail above, the undisputed facts indicate that Amica, NATB, and Black & Guiver did not institute the criminal proceedings against Schettler. Neither did they exert pressure to prolong nor maintain the action. Moreover, the memo referred to by Schettler was written almost 18 months after the criminal investigation had begun and there is controverting evidence that Amica was unwilling to interfere in the criminal proceedings even if Schettler had repaid the money. Mr. Rosenthal stated in his affidavit that following the filing of criminal charges, Schettler phoned Amica and offered to make restitution. In a letter to Lamar Guiver, dated June 21, 1984, Mr. Rosenthal indicated Amica was willing to resolve all its claims against Schettler in exchange for restitution, but emphasized:

> [w]hile we are willing to accept this as final conclusion of our claims, we believe it is up to the District Attorney of Salt Lake County to make any independent decisions they [sic] may wish on the fraud claims.
>
> It is possible that if Salt Lake County is not willing to drop the criminal charges, Mr. Schettler will not agree to settling the claim with us, but that would appear to be beyond our control at this point.

Schettler's citation to the record does not raise a material factual issue with respect to the abuse of process cause of action, and accordingly, the trial court properly dismissed the claim.

### Defamation

Utah Code Ann. § 78–12–29(4) (1988), provides that an action for defamation must be brought within one year. Schettler filed his counterclaim and third-party complaints on December 4, 1985. The statute of limitations was interposed as an affirmative defense. Schettler has not cited in his brief any defamatory statements, oral or written, within the year preceding the filing of his claim, and accordingly, his claim for defamation is barred by the statute of limitations.

Finally, Schettler's fifth and sixth claims are without merit. Based on the undisputed facts set out above, there is no basis for a finding of intentional infliction of emotional distress, *see Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344, 346–47 (1961), or negligence.[7]

■ Based on the foregoing, we affirm the trial court's order dismissing Schettler's counterclaim and third-party complaints.[8]

---

7. In his amended counterclaim and third-party complaints, Schettler merely reincorporates all previous allegations and states that "the conduct of Plaintiff and Third–Party Defendants as described above was negligent." Conclusory allegations in a pleading are insufficient to overcome a motion for summary judgment. Utah R.Civ.P. 56(e).

8. Although the parties did not object below, we note that the third-party complaint was not an

## II.
### SCHETTLER'S MOTION FOR SUMMARY JUDGMENT

■ We next address whether the trial court properly denied Schettler's motion for summary judgment to dismiss Amica's complaint.

Amica alleged fraud, misrepresentation, breach of contract, and conversion in its complaint. In opposition to Schettler's motion for summary judgment, Amica presented the following testimony: (1) Subsequent to Pioneer's repossession of Schettler's automobile, and before Schettler submitted the theft claim, Pioneer's manager received a call from Schettler during which the manager advised Schettler that Pioneer had the automobile, (2) notwithstanding that Schettler denies making the call to Pioneer's manager, Schettler told a friend that he had made the call to Pioneer Dodge, and (3) the officer who investigated the stolen automobile report asked Schettler if it was possible the automobile had been repossessed and Schettler responded, "no way."

The evidence before the trial court created material factual issues with respect to Amica's claims of fraud, misrepresentation, conversion, and breach of contract against Schettler and was sufficient to overcome Schettler's motion for summary judgment. In addition, Schettler admits in his briefs that there is a factual dispute as to whether Schettler knew or had reason to know the whereabouts of his automobile at the time he reported it stolen. Accordingly, we affirm the trial court's denial of Schettler's motion for summary judgment.

## III.
### DEFAULT JUDGMENT
*Entry of Default Judgment*

On February 23, 1987, Schettler's default was entered pursuant to Rule 37(b)(2)[9] of the Utah Rules of Civil Procedure for his failure to comply with a court order compelling response to discovery.

The imposition of sanctions is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *First Fed. Sav. & Loan Ass'n v. Schamanek,* 684 P.2d 1257, 1266 (Utah 1984). *See also Tucker Realty, Inc. v. Nunley,* 16 Utah 2d 97, 396 P.2d 410, 412 (1964). Imposing sanctions for a party's refusal to respond to a court order compelling discovery is a harsh sanction and therefore, requires "a showing of 'willfulness, bad faith, or fault' on the part of the non-complying party." *Fed. Sav. & Loan Ass'n,* 684 P.2d at 1266 (quoting *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958)). "Willful failure" has been defined as " 'any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown.' " *M.E.N. Co. v. Control*

---

appropriate means for asserting these claims against NATB and Black & Guiver. A third-party action is available only to assert a claim against "a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him." Utah R.Civ.P. 14(a). *See* C. Wright & A. Miller, *Federal Practice and Procedure* § 1446 at 246 (1971) ("A third-party claim may be asserted under Rule 14(a) only when the third-party's liability is in some way dependent on the outcome of the main claim or when the third-party is secondarily liable to defendant."). *See also Hughes v. Housley,* 599 P.2d 1250, 1253 (Utah 1979). By contrast, Schettler's claims against the other parties were for sums greatly exceeding what Amica sought to recover from him, and were in no way dependent on the outcome of the main action, as are claims for "indemnity, subrogation, contribution, express or implied warranty" and the like, which may properly be brought in a third-party complaint. C. Wright & A. Miller, *Federal Practice and Procedure* § 1446 at 246–48

(1971). Any joinder of the other parties in this action should have been accomplished pursuant to Utah R.Civ.P. 13(g), which provides: "When the presence of parties other than those to the original action is required for the granting of complete relief in the determination of a counterclaim or cross-claim, the court shall order them to be brought in as defendants as provided in these rules, if jurisdiction of them can be obtained."

**9.** Rule 37(b)(2) provides:

*Sanctions by court in which action is pending.* If a party ... fails to obey an order to provide or permit discovery, ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

(C) an order striking out pleadings or parts thereof, ... dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party. ...

*Fluidics, Inc.,* 834 F.2d 869, 872–73 (10th Cir.1987).

■ Schettler asserts the trial court abused its discretion in striking his answer for two reasons. First, he argues the only basis for the sanction was his failure to produce personal tax returns, and such failure was not willful but due to inability. Schettler's position is not supported by the record. It is clear from the trial court's order that failure to produce personal tax returns was not the only reason for entering Schettler's default. Furthermore, Schettler failed to demonstrate to the trial court at the hearing before his default was entered, that his failure to produce the tax returns was due to inability.

■ Although the trial court did not make a specific finding of "willfulness, bad faith or fault," such failure is not grounds for reversal if "a full understanding of the issues on appeal can nevertheless be determined by the appellate court." *Texas Extrusion Corp. v. Palmer, Palmer & Coffee,* 836 F.2d 217, 221 (5th Cir.1988). *See also Colorado Flying Academy, Inc. v. United States,* 724 F.2d 871, 878 (10th Cir. 1984), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986) (findings must appear either in the lower court's opinion or elsewhere so that they sufficiently indicate the factual basis for its ultimate conclusion). The record in this case clearly demonstrates a pattern of aggravated misconduct in the form of willful and deliberate disobedience of discovery orders, fabricated testimony, and attempted witness tampering. In light of this overwhelming evidence of willful and bad faith conduct, the trial court's failure to make a specific finding of willfulness was not reversible error.

■ Schettler's second point of error is that the information requested did not relate to the merits of Amica's case, but rather, went to the issue of punitive damages. Schettler's challenge to the merits of the discovery order is untimely. It is fundamental that once the production of documents is demanded, a party is obliged to produce them unless he objects or moves for a protective order. Utah R.Civ.P. 37(d). Schettler did neither. Instead, Schettler simply refused to cooperate in discovery. Moreover, Schettler cites no authority for the proposition that discovery sanctions are inappropriate when the documents not produced are relevant only to the issue of punitive damages.[10]

The trial court did not abuse its discretion in entering Schettler's default for his failure to comply with the court's discovery order.

### Jury Trial

We next address whether the trial court erred in denying Schettler a jury trial and determining damages by reference to affidavits.

■ The procedure for assessing damages after the entry of a default judgment is governed by Rule 55(b)(2) of the Utah Rules of Civil Procedure. Pursuant to Rule 55, when a plaintiff's claim is for other than a sum certain or an amount that by computation can be made certain, judgment must be entered by the court and "[i]f, in order to enable the court to enter judgment or to carry it into effect, it is necessary to take an account or to determine the amount of damages ... *the court may conduct such hearings or order such references as it deems necessary and proper.*" Utah R.Civ.P. 55(b)(2) (emphasis added).

Schettler contends that under Rule 55 he has a right to a jury trial on the issue of damages notwithstanding the entry of default. We disagree, and hold that under the Utah Rules of Civil Procedure, there is no right to a jury trial on the issue of damages once default has been entered.

A number of jurisdictions, considering Rule 55, have similarly held that a defaulting party is not entitled to a jury trial on the issue of damages. *See, e.g., Farrell v. Hursh Agency, Inc.,* 713 P.2d 1174, 1181 (Wyo.1986) (Rule 55(b) does not itself require a jury trial on the issue of damages); *Johnson v. Murray,* 201 Mont. 495, 656 P.2d 170, 174 (1982) (a party in default has

---

**10.** A similar factual situation was before the Wyoming Supreme Court in *Farrell v. Hursh Agency, Inc.,* 713 P.2d 1174 (Wyo.1986). In *Farrell,* the court rejected appellants "good cause" assertion for their failure to produce income tax returns on the grounds that the returns need not be produced since they went only to the question of punitive damages. *Id.* at 1180.

no constitutional or statutory right to a jury trial on the issue of damages); *Eisler v. Stritzler,* 535 F.2d 148, 153 (1st Cir.1976) (Rule 55 of the Federal Rules does not require a jury trial on the issue of damages); *Henry v. Sneiders,* 490 F.2d 315, 318 (9th Cir.1974), *cert. denied,* 419 U.S. 832, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974) (trial court properly entered defendant's default for failure to comply with a discovery order and defendant was not entitled to a jury trial on the issue of damages).

■ Alternatively, Schettler claims that even if in the first instance he did not have a right to a jury trial, under Utah R.Civ.P. 38, the trial court nonetheless improperly allowed Amica to unilaterally withdraw its jury demand following the entry of his default. We disagree.

In its complaint, Amica requested a jury trial and subsequently withdrew its request following the entry of Schettler's default. Thereafter, Schettler requested a jury trial. Rule 38(b) of the Utah Rules of Civil Procedure provides that any party may demand a trial by jury and subsection (d) provides that once made, a demand for a jury trial may not be withdrawn without the consent of the parties.

■ Rule 38(d) of both the Federal Rules of Civil Procedure and the Utah Rules of Civil Procedure require the consent of both parties before a jury request may be withdrawn. However, the consent requirement of Utah R.Civ.P. 38(d) does not apply once default has been entered. This is so because Rule 55(b) of the Utah Rules provides that a trial court may "conduct such hearings or order such references as it deems necessary and proper." By contrast, its federal counterpart provides that the trial court "may conduct such hearings or order such references as it deems necessary and proper and *shall accord a right of trial by jury to the parties when and as required by any statute of the United States.*" Fed.R.Civ.P. 55(b) (emphasis added). The federal cases [11] finding that the Rule 38 consent requirement is applicable to default situations

have done so under the theory that the Rules of Federal Procedure *i.e.,* Rule 38, have the force and effect of statutes and thus, under the language of Federal Rule 55(b), the right to a jury trial is preserved.

Unlike the federal rules, however, the Utah rules are less restrictive and grant a trial court the discretion to determine whether a jury trial is appropriate in setting damages. Rule 55(b) of the Utah Rules of Civil Procedure does not specify a right to a jury trial as do the federal rules but instead, permits a court to *conduct hearings or order such references as the court deems necessary.* Accordingly, we hold the trial court did not err by allowing Amica to unilaterally withdraw its request for a jury trial.

■ Finally, Schettler argues that even if he does not have a right to a jury trial, it was error to submit the issue of damages on affidavits. This issue is controlled by the Utah Supreme Court's holding in *Synergetics v. Marathon Ranching Co., Ltd.,* 701 P.2d 1106 (Utah 1985). In *Synergetics,* the Court upheld the trial court's order striking defendants' answer and counterclaim and entering default judgment. The court also found that assessing damages based " 'upon the filing of appropriate affidavits concerning punitive and actual damages' " was not error. *Id.* at 1112.

In *Synergetics,* as in this case, plaintiffs filed affidavits specifying in detail the nature and extent of the damages incurred. Defendants in *Synergetics* did not object to the affidavits nor did they challenge the content thereof with opposing affidavits. *Id.* Accordingly, the Supreme Court held that the district court had afforded defendants a "full opportunity to be heard on the issue of damages." *Id.*

In this case, Amica filed over 200 pages of documentation detailing the extent of their damages. In opposition to Amica's request for damages, Schettler submitted the single affidavit of his counsel. We question the propriety of counsel offering himself as a fact witness, at least as to

---

11. *See, e.g., Bass v. Hoagland,* 172 F.2d 205, 208 (5th Cir.1949). *See generally United States v. 1966 Beechcraft Aircraft Model King Air,* 777 F.2d 947 (4th Cir.1985); *Hutton v. Fisher,* 359

F.2d 913 (3rd Cir.1966); *Kormes v. Weis, Voisin & Co., Inc.,* 61 F.R.D. 608 (E.D.Penn 1974); *Barber v. Turberville,* 218 F.2d 34 (D.C.Cir.1954).

anything other than the reasonableness of the requested attorney fees, but nevertheless, this affidavit was wholly inadequate to refute the overwhelming and voluminous evidence presented by Amica. Schettler's affidavit was conclusory opinion testimony without foundation, merely reciting that the "fees, costs, and expenses incurred in the prosecution of plaintiff's claim and defense against defendant's counterclaim ... are excessive."

Accordingly, we find the trial court offered Schettler a "full opportunity to be heard on the issue of damages" and did not err in awarding damages based on affidavits.[12]

## IV.

### DAMAGES

In its April 23, 1987 memorandum decision, the trial court awarded Amica $98,579.24 in "general damages" which we conclude from a review of the record included $6,925, the amount Amica paid Schettler for his automobile; approximately $12,106.14 as miscellaneous costs; and $79,548.10 as attorney fees. The trial court also awarded $100,000 as punitive damages. In its memorandum in support of its request for damages, Amica submitted the affidavit of Ron Rosenthal. Specifically, Mr. Rosenthal's affidavit enumerated the following expenses:

| | | |
|---|---:|---:|
| Legal Expenses Paid to Strong & Hanni, Attorneys at Law, through 12/31/86 (not including work in process since 12/31/86) | | $64,433.61 |
| Legal Expenses incurred and paid to Hall & Evans, Attorneys at Law, Denver, Colorado (Local counsel for AMICA Mutual Insurance Company) | | 3,391.49 |
| Court Reporters fees and bills through 3/6/87 | | 4,122.35 |
| Accountant fees (KMG Main Hurdman, Merrill Norman) | | 486.00 |
| Claim investigation and adjustment expenses; | | 3,727.49 |
|   1. Black, Nichols & Guiver | $3,562.78 | |
|   2. R.L. Gresham & Company | 164.71 | |
| | $3,727.49 | |
| Loss payment (Check Number 1824946 paid to Carl F. Schettler) | | 6,925.00 |
| Travel expenses and miscellaneous; | | 1,192.64 |
|   1. Airfare and Travel expenses for Ronald Rosenthal and Alan Willson | $1,180.00 | |
|   2. Copying Expenses and Police Report Request Expenses | 12.64 | |
| | $1,192.64 | |
| Legal Fees Incurred and Not Yet Billed | | 11,723.00 |
| Lost Personnel and Secretarial Time | | 2,577.66 |
| TOTAL | | $98,579.24 |

The trial court apparently accepted Amica's submission in its entirety, and awarded the full amount requested by Amica without revealing the legal basis for its award of

---

**12.** We note that the majority of jurisdictions considering the procedural rights of a defaulting party have held that the defaulting party is entitled to cross-examine witnesses and present mitigating evidence. *See, e.g., Paxson v. Rice,* 217 Mont. 521, 706 P.2d 123 (1985) (mitigating evidence should be allowed to be introduced); *Kwik Way Stores, Inc. v. Caldwell,* 709 P.2d 36, 37 (Colo.Ct.App.1985) ("the majority of jurisdictions which have considered the question have held that the defaulting party is entitled to cross-examine witnesses and present evidence in mitigation of unliquidated damages"); *Monte*

*Produce, Inc. v. Delgado,* 126 Ariz. 320, 614 P.2d 862 (Ct.App.1980) (defendants should be allowed to challenge unliquidated damages by introducing evidence on the issue at a hearing).

Our decision that affidavits are sufficient to establish damages after default is limited to situations where no legitimate conflicting testimony is before the court. We believe when conflicting affidavits are presented, the more prudent procedural approach is to conduct an evidentiary hearing affording the defaulting party the procedural protections of cross-examination on the issue of unliquidated damages.

attorneys' fees, investigation expenses, and miscellaneous costs as "general damages."

Ordinarily, if upon review of the record, this Court is able to find *any* legal basis for the trial court's award, we will affirm. *See Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 894–95 (Utah 1988). However, after an extensive review of the record, it is clear that some of the expenses requested by Amica are not recoverable.[13] Furthermore, even if attorney fees are recoverable in this case, they are *not* properly classified as "general damages." Therefore, except to the extent of $6,925, we vacate the judgment insofar as it pertains to the award of "general damages," and remand for further proceedings consistent with this opinion.

■ "As a general rule, a 'default judgment establish[es], as a matter of law, that defendants [are] liable to plaintiff as to each cause of action alleged in the complaint.'" *Dundee Cement Co. v. Howard Pipe & Concrete Prods.*, 722 F.2d 1319, 1323 (7th Cir.1983). Therefore, in effect, the default judgment entered against Schettler established as a matter of law that he committed, 1) fraud, 2) misrepresentation, 3) breach of contract, and 4) conversion.

Nevertheless, it is still incumbent upon the non-defaulting party to establish by

competent evidence the amount of recoverable damages and costs he claims. *Dundee Cement Co.*, 722 F.2d at 1323; *Kwik Way Stores Inc. v. Caldwell*, 709 P.2d 36, 38 (Colo.Ct.App.1985); *Armijo v. Armijo*, 98 N.M. 518, 650 P.2d 40, 42 (Ct.App.1982).

## *Attorney Fees*

■ Utah adheres to the prevailing common-law rule that attorney fees are not recoverable in the absence of a contractual or statutory basis. *See, e.g., Dixie State Bank v. Bracken*, 764 P.2d 985, 988–89 (Utah Ct.App.1988) (and citations therein).[14]

There is no contractual basis for the award of fees in this case. We note, however, at least three possible statutory bases for the award of attorney fees: 1) Utah Code Ann. § 78–27–56 (1987), which provides for an award of fees "if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." *See also Topik v. Thurber*, 739 P.2d 1101, 1104 (Utah 1987); *Cady v. Johnson*, 671 P.2d 149, 151 (Utah 1983); 2) Utah R.Civ.P. 37(a)(4)[15] which provides for the recovery of attorney fees in connection with a *motion* to compel discovery; and 3) Utah R.Civ.P. 37(b)(2)(E)[16] which permits the recovery of fees incurred as a result of a party's fail-

---

**13.** These expenses include pre-litigation investigation, accountant fees, travel expenses, and lost personnel and secretarial time. We do not suggest that such expenses are not recoverable under any circumstances. However, the mere fact that Amica has substantiated out-of-pocket expenses does not automatically establish a legal basis for their award. The trial court awarded over $12,000 in miscellaneous costs requested by Amica. Rule 54(d) of the Utah Rules of Civil Procedure permits the award of "costs" to the prevailing party as a matter of course, but the trial court's failure to make specific findings in this regard renders meaningful review by this Court impossible. There are some "costs" of litigation that simply are not recoverable as taxable costs, and unless a legal basis exists for their recovery, the expenses set forth above were improperly included in the trial court's general damage award.

**14.** In some circumstances, attorney fees may be recoverable as an element of damages under the "third-party tort rule." *See, e.g., South Sanpitch Co. v. Pack*, 765 P.2d 1279, 1283 (Utah Ct.App. 1988). The third-party tort rule is inapplicable in this case.

**15.** The rule provides with our emphasis:
If the motion [to compel] is granted, the court shall, ... require the party or deponent whose conduct necessitated the motion ... *to pay to the moving party the reasonable expenses incurred in obtaining the order, including attorney fees*, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust.
Utah R.Civ.P. 37(a)(4).

**16.** Rule 37(b)(2)(E) provides for a similar assessment of attorney fees provided in rule 37(a)(4) set forth above.

ure to *comply* with a court order.[17] In addition to the possible statutory bases, Utah courts have also permitted the amount of attorney fees expended to be considered in calculating punitive damages when punitive damages are warranted. *Jorgensen v. John Clay and Co.*, 660 P.2d 229, 233 (Utah 1983); *DeBry & Hilton Travel Servs., Inc. v. Capitol Intern. Airways, Inc.*, 583 P.2d 1181, 1185 (Utah 1978); *Dahl v. Prince*, 119 Utah 556, 230 P.2d 328, 329 (1951).

However, none of the theories taken separately or in conjunction with one another, would permit the wholesale recovery of all the attorney fees and miscellaneous costs requested by Amica in its affidavit. Furthermore, each statutory basis requires findings as to when and why the attorney fees were incurred.

For instance, in order to recover fees under § 78–27–56, a trial court must make findings that 1) the claim or claims were "without merit," and 2) the party's conduct was lacking in good faith. *See Cady v. Johnson*, 671 P.2d 149, 151 (Utah 1983). The record adequately supports that Schettler's counterclaim and third-party complaints were without merit, and the trial court concluded that Schettler acted in bad faith. However, under § 78–27–56, only those fees incurred in *defending against* Schettler's claims would be recoverable. The statute would not permit Amica to recover the fees it incurred in pursuing its claims. The trial court's award of attorney fees does not make that distinction, but instead awards the entire amount. Moreover, the evidence submitted by Amica does not make the distinction, thereby precluding us from making an independent determination.

Similarly, under Rule 37 of the Utah Rules of Civil Procedure, which is substantially patterned after its federal counterpart, appellate courts considering the federal rule have held, with our emphasis, that a trial court must "sufficiently express the basis for the sanctions imposed to identify the *excess costs reasonably incurred....*" *Braley v. Campbell*, 832 F.2d 1504, 1513 (10th Cir.1987) (citation omitted). On the record before us, we cannot determine what, if any, excess costs were incurred.

Accordingly, we find the trial court erred in 1) awarding Amica certain items of expenses that without appropriate findings are not properly recoverable as general damages, attorney fees, or taxable costs, 2) designating the award of attorney fees as "general damages," and 3) awarding Amica the full amount of its request for attorney fees without designating the legal basis for its award. Except to the extent of $6,925, we vacate the award of $98,579.24 as "general damages" and remand for further proceedings consistent with this opinion.

We emphasize that the uncontroverted evidence demonstrates the attorney fees incurred by Amica were reasonable. Thus, on remand it is unnecessary to relitigate this issue. As concerns attorney fees, we remand for a review and allocation of the *recoverable* fees under the appropriate legal bases.

### Punitive Damages

We have no doubt that punitive 'damages are warranted in this case. The record is replete with egregious and intolerable conduct both by Schettler and his previous counsel. The trial court originally awarded $100,000 in punitive damages. Based on a general damage award of $98,579.24, this one-to-one ratio is clearly rea-

---

**17.** Amica claims attorney fees were properly awarded under Utah Code Ann. § 76–6–412(2) (1978). We disagree.

Utah Code Ann. § 76–6–521 (1978) provides that any person who presents a fraudulent insurance claim is punishable "as in the manner prescribed for theft of property of like value." Theft of property valued in excess of $1,000 is punishable as a second degree felony. *See* Utah Code Ann. § 76–6–412(1)(a)(i) (1978). Subsection (2) provides with our emphasis:

Any person who has been *injured by a violation of subsection (1),* ... may bring an action against any person ... for three times the amount of actual damages, ... costs of suit and reasonable attorneys' fees.

*Id.* at § 76–6–412(2).

Schettler was *acquitted* of criminal insurance fraud, thus Amica has not "been injured by a violation" of the theft statute. Accordingly, the provisions are inapplicable to this case.

sonable in light of Utah authority. However, the trial court incorrectly categorized attorney fees and other expenses as "general damages." Attorney fees are more properly considered costs and go on neither side of the scale when determining whether the amount of punitive damages awarded "bear[s] a reasonable relation" to the amount of general damages. Thus, we must review the award of $100,000 in punitive damages in light of what we consider Amica's "general damages," namely the $6,925 paid to Schettler for his allegedly "stolen" automobile and determine whether the award is excessive.

■■■■■ In order to recover punitive damages, a party must prove conduct that is willful and malicious or that manifests a knowing and reckless indifference toward, and disregard of, the rights of others. *Johnson v. Rogers*, 763 P.2d 771, 774 (Utah 1988); *Biswell v. Duncan*, 742 P.2d 80, 84 (Utah Ct.App.1987). The trial court found, and the record supports that Schettler's conduct warranted the imposition of punitive damages.

As reflected in a number of Utah cases, punitive damages "'are not intended as additional compensation to a plaintiff, [and] must, if awarded, serve a societal interest of punishing and deterring outrageous and malicious conduct which is not likely to be deterred by other means.'" *Atkin Wright & Miles v. Mountain States Tel. & Tel.*, 709 P.2d 330, 337 (Utah 1985) (quoting *Behrens v. Raleigh Hills Hosp. Inc.*, 675 P.2d 1179, 1186 (Utah 1983)); *Synergetics v. Marathon Ranching Co., Ltd.*, 701 P.2d 1106, 1112 (Utah 1985). Punitive damages should represent more than a mere inconvenience to the defendant and should be sufficient to send a message to both the defendant and others that such conduct will not be tolerated. *Cruz v. Montoya*, 660 P.2d 723, 727 (Utah 1983).

■■■ A trial court should consider seven factors in assessing the *amount* of punitive damages: (1) the relative wealth of the defendant, (2) the nature of the alleged misconduct, (3) the facts and circumstances surrounding the misconduct, (4) the effect thereof upon the lives of the plaintiff and others, (5) the probability of future recurrence of the misconduct, (6) the relationship between the parties, and (7) the amount of actual damages awarded. *VanDyke v. Mountain Coin Mach. Dist.*, 758 P.2d 962, 965 (Utah Ct.App.1988). We have also held that "punitive damages must bear a reasonable relationship to actual damages," *id.* at 966 (citation omitted),[18] although "punitive damages need not be a certain percentage of or even less than general damages." *Cruz*, 660 P.2d at 727.[19] The trial court has broad discretion in weighing these factors and determining an appropriate award, and we will not disturb its conclusions absent an abuse of discretion. *See Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 312 (Utah 1982).

As to each of these factors, there is sufficient evidence in the record to uphold the trial court's determination. A financial statement as of May, 1986, revealed Schettler's personal net worth to be almost $1.5 million dollars. The remaining factors are similarly well documented in the record. The more difficult issue is whether under the facts of this case, the $100,000 punitive damage award bears a reasonable relationship to the $6,925 actual damage award.

As we indicated, there is no fixed formula for determining the "reasonableness" of a punitive damage award. *Cruz*, 660 P.2d at 727. The Utah Supreme Court has previously held that a 12 to 1 ratio was grossly disproportionate considering the defendant's conduct "did not reflect a high degree of malice." *Bundy v. Century Equip. Co.*, 692 P.2d 754, 759–60 (Utah 1984). However, in *Van Dyke*, this Court allowed a

---

18. *See generally Von Hake v. Thomas*, 705 P.2d 766, 771 (Utah 1985); *Synergetics v. Marathon Ranching Co., Ltd.*, 701 P.2d at 1106; *Jensen v. Pioneer Dodge Center, Inc.*, 702 P.2d 98, 101 (Utah 1985); *Bundy v. Century Equipment Co.*, 692 P.2d 754, 760 (Utah 1984); *Cruz*, 660 P.2d at 723 (Utah 1983).

19. The Utah Supreme Court has affirmed punitive damages in excess of the amount of general damages. *See Leigh Furniture and Carpet Co. v. Isom*, 657 P.2d 293, 313 n. 12 (Utah 1982) (and cases cited therein).

punitive damage award 50 times greater than the actual damage award. 758 P.2d at 966. We stated:

> [W]e also believe that a higher ratio of punitive damages to actual damages than that allowed in *Bundy* is appropriate in this case, because, unlike *Bundy*, the conduct in this case was found by the jury and the trial court to be motivated by vindictiveness and ill will.

*Id.*

Similarly, we believe a higher ratio than that allowed in *Bundy* may be warranted in this case. We need not repeat the evidence before the trial court, some of which is outlined in the "Procedural Background" section of our opinion, when it made its determination, but it is evident that Schettler's conduct went far beyond the bounds of acceptable behavior and must not be tolerated. The nature of the conduct should be carefully considered when reviewing the relationship between actual and punitive damages and a higher multiple allowed to punish *clearly outrageous conduct.* Punitive damages are intended to punish and "to take the profit out of wrongdoing where compensatory damages are small in relation to the financial resources of a defendant...." *Behrens v. Raleigh Hills Hosp., Inc.,* 675 P.2d 1179, 1187 (Utah 1983).

However, since we vacated the general damage award upon which the punitive award was based, we also vacate the punitive damage award, and remand for a redetermination consistent with our opinion. We emphasize, however, that based on the egregiousness of the conduct, the abundant financial resources of the defendant, the small amount of general damages, and the uncompensated expenses caused by Schettler's conduct, we *do not* find the ratio between the $6,925 general damage award and the $100,000 punitive damage award necessarily excessive. Rather, we defer to the trial court to redetermine the punitive damage award in light of our decision redefining the amount of "general damages" recoverable as such.

## V.

### MOTIONS FOR NEW TRIAL AND TO SET ASIDE DEFAULT

On June 4, 1987, Schettler filed a motion for a new trial pursuant to Rule 59 and a motion for relief from final judgment pursuant to Rule 60(b) of the Utah Rules of Civil Procedure on the grounds of newly discovered evidence. Both motions were denied by the trial court on June 24, 1987. Schettler has not appealed the trial court's June 24 denial of his motions. Instead, on July 9, 1987, Schettler made a second motion for a new trial and for relief from judgment again on the grounds of newly discovered evidence. On August 17, 1987, the trial court denied Schettler's second motion. On September 14, 1987, Schettler appealed the trial court's August 17 order.

As discussed below, we find that Schettler's June 4 motion for a new trial was untimely, and thus do not reach the merits of Schettler's substantive claims. We further find that Schettler's second motion for relief is barred by the doctrine of "law of the case." Finally, we hold that the trial court's order of June 24, 1987, denying Schettler's 60(b) motion was a final appealable order, and since Schettler has not timely appealed that order, we need not address whether the trial court abused its discretion in denying his motion for relief from final judgment.

### Motion for New Trial

■ Rule 59(b) of the Utah Rules of Civil Procedure provides that a motion for a new trial must be made not later than 10 days after entry of judgment. In the present case, final judgment was entered May 6, 1987. Schettler filed his motion for a new trial on June 4, almost one month after the entry of final judgment. "When such an untimely motion is made, the trial court's only alternative is to deny the motion." *Burgers v. Maiben,* 652 P.2d 1320, 1321 (Utah 1982) (per curiam). Accordingly, the trial court properly rejected Schettler's motion for a new trial.

### Second Motion to Set Aside Barred by Law of the Case

Once a default judgment has been *entered*, it can only be set aside in accordance with Rule 60(b) of the Utah Rules of Civil Procedure.[20]

Schettler asserted newly discovered evidence under Rule 60(b)(2),[21] as grounds for setting aside the default judgment entered against him. To support his first motion for relief, Schettler submitted the single affidavit of Wayne Schoenfeld, Pioneer Dodge's manager. In his affidavit, Mr. Schoenfeld changed his previous sworn trial testimony that the phone call made to him after he towed Schettler's automobile was from Carl Schettler, stating he now believed the call was made by one of his employees and not Schettler.

Schettler concedes that ordinarily once a motion to set aside is denied, a second post-judgment motion for relief is barred. Nevertheless, Schettler contends that the trial court, in the first proceeding, granted him leave to file additional affidavits in support of his motion.

■ Schettler's position fails for two reasons. First, he fails to cite any portion of the record to support his allegations that the trial court granted him leave to file a second motion. In fact, Schettler admits that no such record exists. As we have repeatedly held, if counsel on appeal does not provide adequate citations to the record, we need not reach the merits of his or her substantive claims. It is counsel's responsibility to ensure that lower court proceedings are properly included in the record.

■ Furthermore, Schettler's second motion is clearly barred by "law of the case." "The purpose of the doctrine of 'the law of the case' is that in the interest of economy of time and efficiency of procedure, it is desirable to avoid the delays and the difficulties involved in repetitious contentions and rulings upon the same proposition in the same case." *Richardson v. Grand Central Corp.*, 572 P.2d 395, 397 (Utah 1977). The doctrine is clearly applicable to this case. Both motions were made pursuant to Rule 60(b) and asserted newly discovered evidence as grounds for relief. Generally, Schettler's affidavits filed in support of his second motion confirm that Schettler did not file income tax returns from 1978–1986. However, the information included in these affidavits was available to Schettler at the time he filed his first 60(b) motion and with due diligence could have been included in the original motion. In fact, this information was available to Schettler *prior* to the trial court's default judgment order, and permitting successive post-judgment motions such as Schettler's unjustifiably prolongs the "life of a lawsuit." *Sears v. Sears*, 85 Ill.2d 253, 52 Ill.Dec. 608, 610, 422 N.E.2d 610, 612 (1981).

> There must be finality, a time when the case in the trial court is really over and the loser must appeal or give up. Successive post-judgment motions interfere with that policy. And justice is not served by permitting the losing party to string out his attack on a judgment over a period of months, one argument at a time, or to make the first motion a rehearsal for the real thing the next month.

*Id.* 52 Ill.Dec. at 610–611, 422 N.E.2d at 612–13.

Moreover, improper or untimely motions do not toll the time for appeal from final orders. *Fackrell v. Fackrell*, 740 P.2d

---

**20.** *Calder Bros. Co. v. Anderson*, 652 P.2d 922, 926 n. 4 (Utah 1982). Utah courts recognize that entry of default and entry of default judgment is a bifurcated process. An "entry of default" may be set aside under Rule 55(c). Once "judgment by default" is entered, however, it may be set aside only pursuant to Rule 60(b). *Id.*

**21.** Rule 60(b)(2) of the Utah Rules of Civil Procedure provides:

> On motion and upon such terms as are just, the court may in the furtherance of justice relieve a party or his legal representative from a final judgment, order, or proceeding for the following reason:
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59 (b)....

1318, 1319 (Utah 1987). It is well settled under Utah law, an order denying relief under Rule 60(b) is a final appealable order. *Mascaro v. Davis*, 741 P.2d 938, 946 (Utah 1987). If Schettler believed the trial court erred in denying his first motion to set aside the default judgment, the appropriate remedy was by direct appeal within the prescribed 30–day period. Schettler chose instead to file a second post-judgment motion, and the time for filing a notice of appeal with this Court on his first 60(b) motion continued to run. *See Burgers v. Maiben*, 652 P.2d 1320, 1322 (Utah 1982). Schettler did not file his final notice of appeal until September 14, 1987, two months after the entry of the trial court's order and, accordingly, this Court "cannot take jurisdiction over an appeal which is not timely brought before it." *Id.* Therefore, Schettler's September 14, 1987, appeal is dismissed.

## CONCLUSION

In summary, we affirm the trial court's order, 1) granting cross and counterclaim defendants' motions for summary judgment, 2) entering Schettler's default judgment for his failure to comply with discovery orders, and 3) awarding general damages to the extent of $6,925. We affirm the trial court's order denying Schettler's motion for summary judgment on Amica's complaint. We further affirm the trial court's order denying Schettler's various motions for relief from final judgment. Finally, we vacate the trial court's award of "general damages" in excess of $6,925, and the $100,000 punitive damage award, and remand for further proceedings consistent with this opinion.

JACKSON and ORME, JJ., concur.